IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ST. JOSEPH'S HOSPITAL HEALTH CENTER,<br><br>       Plaintiff,<br><br>v.<br><br>AMERICAN ANESTHESIOLOGY OF SYRACUSE, P.C., AMERICAN ANESTHESIOLOGY, INC., NMSC II, LLC and NORTH AMERICAN PARTNERS IN ANESTHESIA, L.L.P.,<br><br>       Defendants. | Civil Action No.    5:24-cv-276 (FJS/ML)<br><br>**COMPLAINT FOR DECLARATORY JUDGMENT**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff St. Joseph's Hospital Health Center ("St. Joseph's") brings this action against Defendants American Anesthesiology of Syracuse, P.C., ("American Anesthesiology"), American Anesthesiology, Inc., NMSC II, LLC ("NMSC") and North American Partners in Anesthesia, LLP ("NAPA") (collectively, "Defendants"), based on the following allegations:

## INTRODUCTION

1.    St. Joseph's is bringing this case because Defendants (who are the exclusive providers of professional anesthesia services at St. Joseph's) are using noncompete and nonsolicitation clauses to maintain a virtual monopoly and to demand exorbitant payments for critical and understaffed patient services. Defendants seek to compel St. Joseph's to retain them at its hospital, no matter what terms they demand, by prohibiting their providers from freely choosing to work as employees of St. Joseph's or any provider other than Defendants, and thereby cutting off any other sources of anesthesia care. Alternatively, Defendants have demanded an exorbitant multi-million dollar payment to waive the noncompetes.

2.      Overall competition in a number of markets is impacted by Defendants' anticompetitive actions, because this is very far from a typical case involving noncompete restrictions. American Anesthesiology employs more than 20 anesthesiologists and more than 50 certified nurse anesthetists ("CRNAs") who work at St. Joseph's, and all are bound by noncompetes. Since anesthesia care is necessary for all surgery, many invasive cardiac procedures, all endoscopies, all labor epidurals and c/sections, and many other hospital services, these noncompetes and the nonsolicitation clauses threaten to broadly interfere with operations at the hospital, deprive patients of access to care at their chosen hospital and doctors, and harm health care competition and the provision of hospital services in Onondaga County.

3.      These anticompetitive effects are especially significant, because Defendants also exclusively provide anesthesia care at Crouse Health, one of the only two other hospitals in Onondaga County. Because the third major hospital, The State University of New York Upstate Medical University Hospital, is staffed by a medical school faculty, there are effectively no substitutes for Defendants' providers in the market, and Defendants have monopoly power.

4.      Noncompetes and nonsolicitation clauses relating to physician contracts are common when needed to protect (a) patient relationships the physicians may have gained by virtue of the efforts of their employer or (b) trade secrets. But hospital-based anesthesiologists and CRNAs do not have their own patients, and Defendants have no trade secrets. Therefore, there is no reasonable justification for these clauses.

5.      Defendants' conduct as described herein makes clear that they do not see the noncompetes as needed to protect them against unfair competition, but use the noncompetes to impede the free movement of their anesthesia providers so that they can monopolize the value of the providers' scarce services. Indeed, Rafael Cartagena, the CEO of NAPA, has referred to the

2

providers as NAPA's "assets." But the providers are not assets to be controlled or exploited by private equity firms such as NAPA. The noncompetes should be declared void so that the physicians and CRNAs can freely offer their services to patents in need.

6. Defendants' insistence on enforcing the noncompetes and nonsolicitation clauses violates federal and state antitrust laws. Because Defendants are demanding enforcement of these anticompetitive clauses, St. Joseph's is forced to file this litigation to seek a determination that these clauses are unlawful and that St. Joseph's can offer employment to the anesthesiologists and CRNAs working at its hospital in competition with Defendants.

7. The actions described herein have also been undertaken by Defendants (and a related local subsidiary) at another hospital affiliated with St. Joseph's, Holy Cross Hospital in Ft. Lauderdale, Florida. Holy Cross has very similar claims to those brought here by St. Joseph's. However, because the Holy Cross contract provides that venue for any litigation must be in the location at which services are provided, a separate lawsuit is being filed by Holy Cross in the Southern District of Florida raising substantially the same issues as in this lawsuit.

## THE PARTIES

8. Plaintiff St. Joseph's Hospital Health Center is a faith-based, nonprofit, tax exempt corporation organized under and by virtue of the laws of New York and is headquartered in Syracuse, New York.

9. St. Joseph's operates a 431-licensed bed hospital in Syracuse, offering a variety of inpatient and outpatient services, including cardiology, obstetrics, surgery, and Level II trauma care.

10. St. Joseph's has won numerous awards for its strong commitment to patient quality, safety, and satisfaction, including in particular in surgery, heart care and obstetrics:

- "Best Regional Hospital" by U.S. News & World Report

- Safety Grade 'A' rating from Leapfrog® Hospital Safety Grades
- Awarded 3 Stars in CABG, AVR & AVR+CABG by the Society of Thoracic Surgeons
- Comprehensive Center accreditation for Bariatric Surgery
- Surgical Intensive Care Received Beacon Award of Excellence
- Awarded "America's 50 Best for Cardiac Surgery" by Healthgrades
- Awarded "America's 50 Best for Vascular Surgery" by Healthgrades
- Awarded "Joint Replacement Excellence" by Healthgrades
- American Heart Association Award Target: BP Gold Recognition
- Healthgrades America's 100 Best Hospitals for Coronary Intervention™ in 2022
- Healthgrades America's 100 Best Hospitals for Spine Surgery™ in 2022

11.     St. Joseph's is a "Blue Distinction Plus" hospital for spine surgery, bariatric surgery, knee and hip replacement, maternity care and cardiac care. Blue Distinction Plus hospitals are recognized by Blue Cross Blue Shield plans as offering extremely high quality and low cost. St. Joseph's low cost is also reflected in the fact that its average length of stay for hospital care (the amount of time people remain in the hospital), after adjusting for severity of cases, is significantly lower than at either Crouse Health or Upstate Medical University, the two other hospital systems in Onondaga County.

12.     St. Joseph's received the highest ratings from the Society for Thoracic Surgeons for cardiac surgery, and was ranked as a top 50 hospital. U.S. News & World Report rated St. Joseph's Hospital as the best regional hospital in its area. U.S. News & World Report also rated St. Joseph's as a high performing hospital in 13 categories, including heart bypass surgery.

13.     Defendant American Anesthesiology is a professional limited liability corporation based in Syracuse, New York, with its headquarters office in Melville, New York. American

Anesthesiology is the exclusive provider of anesthesia care at St. Joseph's and at Crouse Health, one of the other two hospitals in Onondaga County.

14.　　American Anesthesiology's parent corporation is American Anesthesiology, Inc. American Anesthesiology, Inc. is a Florida corporation, based in Melville, New York.

15.　　The parent corporation of American Anesthesiology, Inc. is NMSC II, LLC, a Delaware limited liability company ("NMSC") with its registered agent in Dover, Delaware. In 2020, NMSC purchased the stock of American Anesthesiology, Inc. from MedNax Corporation.

16.　　NMSC is a subsidiary of North American Partners in Anesthesia, L.L.P. ("NAPA"). NAPA is a New York limited liability partnership, based in Melville, New York. NAPA's website says that it employs 5,000 clinicians, and provides services at 400 facilities nationwide in 22 states. It says that it serves over 2 million patients annually and has approximately $1.8 billion in annual revenues. NAPA says that it is the largest anesthesia services provider in North America.

17.　　NAPA is the ultimate parent of American Anesthesiology, and is also its successor in interest under the agreement between St. Joseph's and American Anesthesiology (the "Agreement"). NAPA executives, including Peter Doerner and others, directly participated in the negotiation of the contract terms applicable to the relationship between St. Joseph's and American Anesthesiology. NAPA supervises and directs the actions of American Anesthesiology. NAPA's executives have been involved in detail in numerous ongoing discussions relating to the operation of anesthesia services at St. Joseph's, including staffing issues. These executives have included Nora Bonconi and Dr. Jay Lee.

18.　　The Agreement was signed by Melissa Montague, the Regional Vice President for Mednax National Medical Group ("Mednax"). Mednax was at that time (in 2018) the ultimate

parent of American Anesthesiology. Mednax later sold American Anesthesiology, Inc. to NMSC. Each of the amendments to the Agreement have been signed by Dr. Jay Lee, Senior Vice President of Clinical Services for NAPA's New Jersey and New York regions. Notice under the Agreement is to be provided to Beth Green, NAPA's Vice President and General Counsel. NAPA is now the successor in interest to American Anesthesiology under the Agreement, and Dr. Jay Lee signed the Third Amendment to the Agreement on behalf of NAPA.

## JURISDICTION AND VENUE

19.     This Court has jurisdiction over this case pursuant to 28 U.S.C. §§ 1331, 1337(a), and 1367; Sections 4 and 16 of the Clayton Act, U.S.C. §§ 16 and 26; and Section 1 of the Sherman Act, 15 U.S.C. § 1. This Court has exclusive jurisdiction over the claims in this case brought pursuant to the Sherman Act and Clayton Act.

20.     Defendants transact business in this district and are subject to personal jurisdiction therein. American Anesthesiology's services are performed at St. Joseph's Hospital in this district, and Section XVI of the Agreement provides that venue shall be proper in the jurisdiction where the services were performed or delivered. The actions complained of herein and giving rise to this Complaint took place in this district. Personnel of NAPA, including Peter Doerner, NAPA's Executive Vice President and Chief Development Officer, and Rafael Cartagena, NAPA's CEO, have been directly involved in in negotiations relating to the provision of services in this District, and, as described above, other NAPA personnel have been directly and repeatedly involved in issues relating  to American Anesthesiology's provision of services in this District. St. Joseph's also has maintained its principal place of business in this district, and faces the threat of injury in this district. Venue is proper in this district pursuant to 15 U.S.C. §§ 15, 22, and 26 and 28 U.S.C. § 1391, as well as the provisions of the Agreement.

## TRADE AND COMMERCE

6

21.     Defendants are engaged in interstate commerce and their activities substantially affect interstate commerce. Millions of dollars of American Anesthesiology's annual revenues for treatment of patients at St. Joseph's come from sources located outside of New York, including payments from Medicare and out-of-state commercial payors, including Aetna, Cigna, United Healthcare, Humana and others. The majority of Defendants' annual revenues from St. Joseph's patients of more than $10 million comes from these sources. Defendants' treat a significant number of patients from states other than New York, including more than 100 cases annually at St. Joseph's involving out-of-state patients (with revenues of thousands of dollars per patient). NAPA provides management services to its health care providers in 22 different states. NAPA clinicians treat more than 2 million patients annually across these states.

22.     St. Joseph's receives hundreds of millions of dollars of annual revenue for procedures requiring anesthesia from sources located outside of New York, including payments from Medicare and from out-of-state commercial payors, including Aetna, Cigna, United Healthcare, Humana and others. St. Joseph's also receives millions of dollars in annual revenues for the treatment of patients from out of state who receive services requiring anesthesia.

23.     Defendants' actions will result in a substantial reduction in competition in the relevant antitrust markets described below, which will substantially affect payments made in interstate commerce by Medicare and commercial payors, as well as payments made by the parties in interstate commerce.

## **FACTUAL ALLEGATIONS**

### **The Role of Anesthesiologists and CRNAs**

24.     An anesthesiologist is a physician, with four to five years of post-medical school training, who specializes in the delivery of anesthesia and related care of patients before, during, and after surgery and other procedures requiring anesthesia. Anesthesiologists also meet with

7

patients and their physicians before these procedures to evaluate patients' health and to ensure that patients' anesthesia care is safe and effective. A CRNA is an advanced practice registered nurse with graduate level education who also provides anesthesia services often in concert with the physician team.

25.     Anesthesiologists and CRNAs administer anesthesia so patients do not feel pain when they are undergoing these procedures. Prior to surgery they place invasive lines and regional nerve blocks. They also perform other functions, including monitoring and maintaining patients' normal vital signs (e.g., respirations, pulse, blood pressure, body temperature); identifying and treating any related emergencies that may occur before, during, or after the procedures (e.g., allergic reactions to medication, bleeding, changes in vital signs); and controlling pain and providing other care post-procedures.

26.     These providers play critical roles in the care of patients in every hospital, since anesthesia is required for all, or virtually all, surgeries and more invasive cardiac procedures, and for deliveries of newborns involving epidurals and cesarean sections, as well as all endoscopies, among other procedures. Surgeries and invasive cardiac procedures are essential components of the services provided by virtually every hospital, to assure full service care to their patients. Since these procedures are the most profitable, their offering also helps hospital systems to be able to afford to offer patients often unprofitable but necessary medical procedures.

27.     Anesthesiologists are able to delegate certain tasks to CRNAs, while supervising their work, freeing up the anesthesiologists' time to provide oversite and care for several cases simultaneously. Therefore, CRNAs help relieve the demand for anesthesiologists personally performing every case.

50448169.30

28.     Typically, hospitals obtain the services of anesthesiologists and CRNAs either by employing them or contracting with an independent group which employs a significant number of the anesthesiologists and CRNAs. Most patients are only indirect purchasers of anesthesia services, with exception of any copays or deductibles.

29.     In seeking the services of anesthesia providers, hospitals may consider both local and national groups. However, all of these groups depend significantly on the supply of anesthesia providers in the local area in which the hospital is situated. Most anesthesia providers are unwilling to uproot their families and relocate unless they were to receive compensation at levels substantially above market rates. In addition, a stable relationship with a core group of local anesthesia providers who know the surgeons, other proceduralists and nursing teams working at the hospital highly enhances the care of patients.

30.     There is a significant shortage of anesthesia providers nationally, and that shortage is expected to grow. In its recent presentations, NAPA has referred to a "National Anesthesia Provider Shortage". According to data provided by NAPA, job postings for anesthesiologists and CRNAs have at least doubled from October 2018 to June 2023. According to NAPA, the demand for anesthesia providers has significantly increased, due to more complex hospital cases and a higher volume of procedures performed in ambulatory surgery centers ("ASCs") and other outpatient settings, increasing the number of venues requiring anesthesia providers. According to public sources, greater than 2,800 anesthesiologists left the work force in 2021 and 2022. NAPA projects a shortage of over 12,000 anesthesiologists over the next decade. For this reason, it is very difficult for a hospital to replace an anesthesiology group.

31.     Subspecialty anesthesia training provides additional skills which are needed to provide anesthesia for cardiothoracic surgeries and interventional pain. For example, cardiac

anesthesiologists must also achieve additional board certifications in transesophageal echocardiography. These specialty trained services are in even more limited supply.

### St. Joseph's Agreements with American Anesthesiology

32.     American Anesthesiology entered into the Agreement in 2018. The Agreement's term has been extended several times, and is currently set to expire on July 1, 2024. A notice of nonrenewal was sent by St. Joseph's on December 29, 2023.

### Defendants' Conduct

33.     The Agreement has imposed unreasonable payment requirements on St. Joseph's in numerous respects:

      a.      Defendants directly charge patients, Medicare, Medicaid, and managed care plans for their providers' services, but require that St. Joseph's subsidize those services, i.e. pay the difference between the revenues collected by Defendants and their "expenses," defined as the amounts they pay to anesthesiologists and CRNAs plus an overall fee (comprising an administrative fee, a clinical oversight fee, and a fee for "other expenses"). That overall fee includes profits. In calendar year 2023, that subsidy amounted to more than $16 million.

      b.      Under the parties' agreement, Defendants are not obligated to take adequate steps to maximize their revenues. Thus, for example, Defendants have no obligation to make reasonable efforts to collect the sums owed them. Nor do they have an obligation to minimize denials of claims submitted to managed care plans, Medicare or Medicaid. Defendants could take a number of steps to minimize denials, including negotiating managed care contracts to appropriately address denial issues, appealing

10

denials of claims and establishing procedures so that their anesthesia providers adequately document their work so as to minimize the likelihood of denials. There are no such obligations contained in the Agreement, and Defendants have been unwilling to agree to benchmarks that would assure that they are adequately performing these functions.

c.   Defendants' costs for clinical providers are unreasonably high because Defendants rely excessively on temporary anesthesia providers ("locum tenens") to fill permanent gaps in their staffing at St. Joseph's. Locum tenens providers are paid far higher than typical rates for employed providers. These factors have significantly increased the costs of anesthesia services to St. Joseph's.

d.   Defendants have refused to provide details regarding their collections to St. Joseph's.

34.   Additionally, the use of locum tenens anesthesia providers is inherently less satisfactory than relationships with permanently employed anesthesia providers. This is because the locum tenens physicians are temporary and do not have ongoing relationships with the surgeons and other physicians who perform the procedures that require anesthesia. These physicians would prefer to use hospital-based anesthesiologists they know and trust rather than to work extensively with locum tenens physicians.

35.   The amount charged by Defendants has become significantly greater over time. In the original agreement between St. Joseph's and American Anesthesiology, the subsidy was capped at approximately $4.4 million with a possible bonus. After the NAPA acquisition, and renegotiation of compensation in the December 31, 2020 amendment, the subsidy was increased

11

to at least $6.6 million. The amendment called for budgeted subsidies in the $5-$6 million range for 2022 and 2023. However, in 2023, Defendants' subsidy exceeded its budget by more than $10 million. Required payments to Defendants have increased steadily from the first quarter of calendar year 2022.

36.     These reimbursement terms, and the levels of reimbursement obtained by Defendants, are well above the levels that would be paid in a competitive market. In fact, Defendants are paid approximately twice the rate per anesthesia site that St. Joseph's affiliate, St. Peter's Health, pays for anesthesia services in Albany, New York. Defendants are able to obtain these levels of reimbursement only because of their elimination of competition through the enforcement of their noncompetes and the nonsolicitation clause.

37.     Defendants have been consistently unable to adequately staff St. Joseph's procedures that require anesthesia. Many anesthesiologists left American Anesthesiology after it was acquired by NAPA in 2020, because they did not wish to work for NAPA. This accentuated the staffing shortfalls at St. Joseph's.

38.     As a result, St. Joseph's has been unable to schedule many endoscopy procedures, and has utilized fewer operating rooms. This has resulted in a reduction in patient care and a diversion of cases to other facilities, leading to a loss of revenue to St. Joseph's.

39.     Among other deficiencies, NAPA has only been able to provide sufficient staffing for two endoscopy rooms at St. Joseph's. St. Joseph's faces a demand that would be sufficient to occupy a third room at least half time, and the hospital has such a third room. But because that room is unstaffed, these additional cases are not performed at St. Joseph's.

40.     There have been significant periods (including at least May, 2022, through October, 2022) during which Defendants provided adequate anesthesia staffing only for 11

12

operating rooms at St. Joseph's when there was a sufficient demand to operate 13 or 14 rooms. As a result, during these periods St. Joseph's lost at least $6.2 million. These constitute damages due to American Anesthesiology's breach of the Agreement.

41.     As a result of the unreliability of Defendants' anesthesia staffing, St. Joseph's has also had difficulty in maintaining the trust of its surgeons and other physicians performing procedures requiring anesthesia. This has caused significant harm to St. Joseph's ability to attract and retain cases from surgeons, cardiologists, OBs and other physicians who perform procedures which require anesthesia.

42.     To attempt to meet demand, Defendants have provided premium pay to anesthesiologists to work extra shifts. However, because the Agreement did not permit the passing on of such premium pay to St. Joseph's, Defendants instead misstated the amount of time worked by its anesthesiologists, submitting false billings.

43.     When these false billings were uncovered, Defendants' explanation was that they did in fact incur these costs, through the need to provide premium pay, but the Agreement did not permit premium pay. Therefore, Defendants explained, they misstated what had occurred in order to obtain more reimbursement. Because St. Joseph's critically needed the anesthesia care provided by Defendants, and had no alternatives due to the noncompetes, it was forced to pay for the premium payments, even though they were not justified under the parties' Agreement, and despite Defendants' misstatement.

44.     Defendants' staffing and performance has been consistently below the level that would be provided in a competitive market.

45.     Because of the inadequate staffing provided by Defendants and their exorbitant charges, in April 2022, St. Joseph's issued a notice of non-renewal of the American

Anesthesiology contract. However, St. Joseph's found that it was unable to recruit replacement anesthesiologists. The only potentially available anesthesiologists within a reasonable distance from the Syracuse area were those employed by Defendants who worked at St. Joseph's or Crouse Health in Syracuse, and those physicians were precluded by their noncompete agreements from leaving Defendants and working for St. Joseph's. Defendants demanded an unreasonable amount to "buy out" the noncompetes, more than 1.5 times the annual salary of each provider. This would have cost St. Joseph's greater than $20 million (equal to one and a half times a full year salary for all anesthesia providers). For this reason, St. Joseph's rescinded its notice of non-renewal, effective December 31, 2022.

46.     More recently, St. Joseph's has experienced a decline in surgeries. In order to operate efficiently and reduce costs, Defendants should have been able to reduce their complement of anesthesiologist providers since there were fewer anesthetizing sites to cover. However, they have not done so. This has imposed further significant costs on St. Joseph's.

47.     NAPA has faced controversies regarding its understaffing of hospital anesthesia services in numerous markets. For example, these same understaffing problems have been identified by Cooperman Barnabas Medical Center in Livingston, New Jersey and Renown Regional Medical Center in Reno, Nevada.

48.     Many of the anesthesiologists employed by Defendants are not happy with Defendants. Many of them have expressed the view that they would much prefer to be directly employed by St. Joseph's. But their noncompete agreements preclude this from happening.

### The Effects of the Noncompetes and Nonsolicitation Clause

49.     The characteristics of the market for anesthesia services in Onondaga County and the contracts entered into by Defendants and St. Joseph's give Defendants the power to effectively shut off anesthesia services at St. Joseph's if St. Joseph's will not pay Defendants

14

what they demand. This is true for several reasons. The first arises from the post term noncompetition clauses entered into by all anesthesiologists and CRNAs who work for Defendants at St. Joseph's. As a result of these noncompetition clauses, these physicians and CRNAs would be unavailable to St. Joseph's after expiration of the Agreement.

50.     Even a one year noncompete is more than sufficient to create these anticompetitive effects. St. Joseph's cannot operate without anesthesia providers for any period of time.

51.     The second reason arises from the nonsolicitation clause in the Agreement. This clause prevents St. Joseph's from inducing employees of American Anesthesiology to leave its employ for a period of at least two years after expiration of the parties' contract.

52.     Third, Defendants employ virtually all the private anesthesiologists and CRNAs working at the private hospitals (St. Joseph's and Crouse) in Onondaga County. The third major hospital, Upstate Medical University Hospital, employs anesthesiologists who are on its medical faculty of State University of New York, and are therefore not available to provide private anesthesia care at St. Joseph's. Since those anesthesiologists are focused on academic medicine, involving teaching and research as well as clinical care, they do not wish to be employed or provide anesthesia services at private non-academic hospitals. As described below, it is not practical for Saint Joseph's to staff its hospitals with anesthesia providers from outside Onondaga County. Therefore, American Anesthesiology controls the supply of anesthesia providers in Onondaga County.

53.     Fourth, the extreme shortage of anesthesia providers nationally makes it especially difficult for hospitals to recruit additional providers.

54.     Fifth, the exclusivity provisions in the Agreement mean that even if St. Joseph's could obtain some of its anesthesia services elsewhere, the exclusivity clause would preclude it from doing so unless it allowed the contract to expire entirely.

55.     There is no possibility that St. Joseph's could obtain anesthesia services from other sources at the volumes needed to completely replace the services rendered by Defendants' anesthesia providers and therefore to operate the hospital. Any effort to replace the anesthesia providers at St. Joseph's en masse would create impossible problems in covering the care of patients for the hospital. Most of Defendants' providers at St. Joseph's have worked at that hospital for many years, and have established close working relationships with St. Joseph's surgeons, cardiologists, OB/GYNs and other physicians. If these physicians were forced to immediately work with other anesthesia providers with whom they were not familiar and the replacement anesthesia providers were not familiar with the hospital facilities, this would cause a significant disruption at St. Joseph's, and would also make it more likely that many of these surgeons, cardiologists, OB/GYNs and other proceduralists would shift some or all of their cases to other hospitals. This would harm both St. Joseph's and overall competition in the market.

56.     For all these reasons, if St. Joseph's sought to end its arrangement with Defendants without the opportunity to seek to employ Defendants' anesthesiologists and CRNAs, it would be faced with a critical shortfall in anesthesia care.

57.     At best, St. Joseph's would be able to staff the hospital with locum tenens anesthesia providers, at rates even more expensive than what is charged by Defendants. Moreover, this would eliminate the continuity in anesthesia care which is valued by surgeons, cardiologists and other physicians performing the procedures that require anesthesia. And it is

unlikely that a sufficient number of locum tenens providers could be obtained in order to fully staff the hospital. Therefore, a significant loss of procedures would be inevitable.

58.     This shortfall would both seriously harm patients needing care which requires anesthesia and cost St. Joseph's critically needed funds. Surgeries and heart procedures are among the activities creating the greatest margin for hospitals, and are needed by St. Joseph's in order for it to remain in business. In fiscal year (ending in June) 2023, St. Joseph's earned approximately $100 million in contribution margin from surgeries, heart procedures and other procedures requiring anesthesia care. Nevertheless, St. Joseph's lost more than $20 million on hospital operations. Without the ability to provide surgeries and other procedures requiring anesthesia care, St. Joseph's would face an impossible financial situation that would not allow it to remain in operation.

59.     Defendants' noncompetes with the St. Joseph's anesthesia providers and the nonsolicitation clause therefore significantly enhance Defendants' market power. Because St. Joseph's has no adequate substitutes for its existing anesthesia providers, Defendants are able to demand higher than competitive rates and contract terms, because they know that the noncompetes preclude St. Joseph's from accessing any realistic alternative to Defendants' anesthesia providers.

60.     In contrast to the $100 million at stake if anesthesia care is not available, St. Joseph's total payments to Defendants for anesthesia services for the same period were approximately $13 million. This imbalance further illustrates why Defendants have such power over St. Joseph's. St. Joseph's is forced to pay exorbitant amounts to Defendants, because otherwise it faces losses that would dwarf the amount paid for anesthesia care.

17

61.     Defendants' insistence on enforcement of their noncompetes has forced St. Joseph's to accept the unreasonable terms demanded by Defendants, to pay exorbitant amounts for anesthesia services, and to accept the staffing inadequacies and shortfalls engaged in by Defendants. These damages are in the millions of dollars.

## The Effect of Private Equity

62.     NAPA is an example of "private equity" firms operating anesthesia practices. NAPA is owned by two well-known private equity firms, American Securities of New York City and Leonard Green & Partners in Los Angeles. Many of NAPA's directors are private equity executives.

63.     Private equity firms operate on a business model which involves the purchase of businesses, their operation for a few years at high profits, and then their resale. These profits are necessary to pay the interest on debt incurred through purchase of these entities. As a result, private equity firms, and the medical practices owned by private equity firms, have an incentive to underprovide care and to overcharge their customers in order to quickly earn unusual returns. A recent study found that more than 20% of the purchases of physician practices by private equity firms involved anesthesia groups. A study published by the Journal of the American Medical Association Internal Medicine in February 2022 analyzed more than 2 million anesthesia claims from 2012 through 2017. The researchers found that costs rose by 26% after anesthesiology practices were taken over by private equity firms.

## St. Joseph's Efforts to Improve Its Anesthesia Coverage

64.     Because of these problems, on December 29, 2023, St. Joseph's gave notice to Defendants that after its current contract expired effective July 1, 2024, it would not be renewing that contract. At the same time, St. Joseph's and its affiliate Holy Cross informed Defendants that they wished to attempt to negotiate either new contracts that appropriately shared the risks of

underpayment, inadequate staffing and excessive costs between the parties, or negotiate an agreement that would eliminate any barrier to efforts to seek to employ Defendants' providers.

65.     In response, Defendants took the position that they were not interested in a new contract that would share risk. They stated that they were willing to negotiate a "buy out", but only at excessive terms, involving one and a half times the annual salary of each anesthesiologist and CRNA. This would amount to a payment of approximately $20 million (equal to one and a half times a full year salary for all anesthesia providers). Defendants indicated that they would be willing to reduce this payment requirement by a modest amount to the extent that St. Joseph's and Holy Cross employed them to manage the anesthesia practices even after the providers were employed by St. Joseph's and Holy Cross.

66.     In response to St. Joseph's and Holy Cross' expressions of great concern and request for a reasonable offer, Defendants' agreed to reduce their buyout demand to a smaller, but still exorbitant number, to what they described as a "discount" to $12 million. But Defendants also demanded that along with these buyouts, that they be paid under a management services agreement at St. Joseph's, Holy Cross and their affiliate Samaritan Hospital in Troy, New York.

67.     Defendants said that if the services agreements were continued with these hospitals, they would expect a three year contract, without any caps on the subsidies they received, without any shared risk if the subsidies grew, without any provisions addressing adequate steps to limit denials by insurers and without any of the other protections that St. Joseph's and Holy Cross requested so that the contract would be reasonable. Defendants also demanded a 5% escalator clause.

19

68.     Significantly, NAPA justified its demand for these huge payments by citing the shortage of anesthesia providers and the noncompete clauses. Mr. Cartagena of NAPA justified his demands by the fact that in New York, Governor Hochul had vetoed a bill that would have outlawed all noncompetes in the state. Mr. Cartagena made it very clear that his demands were based upon the existence of the noncompetes and NAPA's willingness to enforce them. In fact, he referred to the anesthesia providers as NAPA's "assets." Of course, noncompetes are not justifiable as vehicles to impede the free movement of physicians or to make them a company's "assets."

69.     This demand does not bear any relationship to any conceivable claim of loss that Defendants would suffer due to unfair competition resulting from the hiring of the anesthesia providers by St. Joseph's. In fact, there would not be any such losses, since there is no prospect of unfair competition. The demanded payment in fact exceeds the revenues paid to Defendants under the Agreement. The exorbitant nature of the demand thus reflects Defendants' effort to exercise their market power resulting from the existence of their noncompetition clauses. That effort is highly likely to succeed, but for this litigation.

70.     Because of Defendants excessive demands, the parties were unable to reach an agreement.

71.     Defendants' demand for a buyout made clear that they would not waive the noncompetes, and would act to enforce them, absent the exorbitant payment demanded for the buyout. In a number of other cases, NAPA and its affiliates have sued to enforce the employment agreements when Hospitals have sought to employ their doctors. *See, e.g.*, *American Anesthesiology of N.J., P.C. et al. v. Cooperman Barnabas Med. Ctr. et al.*, No. ESX-L-004310-22 (Essex County Ct. 2023); *N. Am. Partners in Anesthesia (Maryland), LLC v. Mack et al.*, No.

C-13-cv-23-000615 (Md. Cir. Ct. 2023); *N. Am. Partners in Anesthesia (Virginia), LLC v. Inova Health Care Servs.*, No. CL-2022-0004271 (Va. Cir. Ct. Fairfax County 2022); *Southeast Anesthesiology Consultants, PLLC et al. v. The Charlotte-Mecklenburg Hospital Authority et al.*, No. 18-cvs-5899 (N.C. Sup. Ct. 2018).

### St. Joseph's Actions and the Need for Litigation

72.     In order to avoid these staffing and payment problems, and because of its inability to obtain reasonable terms from Defendants, St. Joseph's is therefore offering employment to its anesthesiologists and CRNAs, effective on expiration of the Agreement on July 1, 2024.

73.     St. Joseph's believes that most of the anesthesia providers would be interested in being employed by St. Joseph's. However, as described above, Defendants' noncompete agreements with their anesthesiologists and CRNAs and the nonsolicitation clause in the parties' Agreement threaten to interfere with these choices. Defendants refuse to waive these provisions without payment of unreasonable and exorbitant buy out fees.

74.     If the noncompetes and nonsolicitation clause deterred the anesthesia providers from accepting St. Joseph's offers of employment, this would force St. Joseph's into an untenable dilemma: pay exorbitant fees for anesthesia services or face a crippling shortage of anesthesia providers.

### Relevant Antitrust Service Markets

### Hospital-Only Anesthesia Services

75.     One relevant service market in which to assess the challenged conduct is the market for professional anesthesia services provided in community (nonacademic) hospitals. This service market includes services provided by anesthesiologists and CRNAs. It encompasses (1) all inpatient anesthesia services, including surgical, cardiac and obstetric anesthesia

21

performed while the patient is admitted to a hospital; and (2) any other anesthesia services that are provided in a hospital setting.

76.    This relevant service market does not include anesthesia services provided at Upstate Medical University Hospital, because Upstate is an academic medical center which employs professors of medicine to teach anesthesiology, as well as residents and fellows, all of whom provide anesthesia services in conjunction with their educational mission. Anesthesia providers at Upstate choose employment there because they wish to combine clinical care with education and research. Those physicians would not readily switch to providing care in a non-academic setting for a small but significant increase in price. As a result, the Upstate anesthesia providers do not compete with providers at other hospitals. As a result, there is no reasonable substitute for a hospital seeking anesthesia providers for the available non-academic providers in Onondaga County.

77.    The relevant market excludes anesthesia services that are provided outside a hospital setting. Non-hospital settings are not good substitutes for the surgical, cardiac and obstetric procedures (most of the procedures requiring anesthesia) performed in hospitals, and as a result anesthesia services provided in a non-hospital setting are not a substitute for hospital-based anesthesia services.

78.    Whether a patient receives anesthesia in a hospital or non-hospital setting is not determined in any way by the cost of anesthesia providers. Patients receive surgery or heart procedures on an inpatient basis (requiring an overnight stay) based solely on the seriousness of the procedure and/or the characteristics of the patient (e.g. whether the patient is old, infirm or has comorbidities). Cases are only performed on an inpatient basis when that is viewed as medically required, because the cost of inpatient care is many times the cost of outpatient care.

Moreover, anesthesia care, as described above, is a small fraction of the cost of the surgeries and other procedures for which anesthesia is necessary.

79.     Similarly, patients often receive outpatient surgery at the hospital rather than at an ambulatory surgery center or other nonhospital setting (even for procedures which are sometimes performed outside the hospital), because the patient's characteristics (age, infirmity or comorbidities) make ready access to a hospital's emergency facilities and other backup services medically prudent.

80.     Additionally, because the cost of anesthesia is only a small fraction of the cost of the procedures requiring anesthesia, no purchaser of anesthesia services would move a procedure from the hospital to non-hospital setting as a result of an increase in the price of anesthesia services.

81.     The Centers for Medicare and Medicaid Services ("CMS") maintain a list that distinguishes between hospital-only and other anesthesia services for governmentally insured patients. The list identifies anesthesia billing codes that may be used for ambulatory surgical centers. All other anesthesia codes must be billed in a hospital setting. Commercially insured patients generally face similar billing rules, either formally or because hospitals adopt CMS policy to remain certified for government insurance programs.

82.     Alternatively, the relevant market is the market for employment of anesthesia providers in hospitals.

83.     Hospital-only anesthesia services require providers to practice under conditions distinct from non-hospital services. Hospitals often need anesthesia providers to cover long shifts and overnight call. Unlike non-hospital procedures, which are frequently scheduled in advance,

23

procedures performed during overnight call are often hospital-only or inpatient services, such as anesthesia for emergency surgery.

84.   Anesthesia providers providing pain management services or working at outpatient centers such as ambulatory surgery centers are not reasonable substitutes for anesthesia providers working in the hospital. That is because hospital services require providers who are willing to undertake more intensive cases and be available on-call for unanticipated cases. Many anesthesia providers working in the non-hospital outpatient setting are unwilling to undertake these additional duties and responsibilities.

85.   Additionally, ASCs generally pay more for anesthesia providers because they have more higher paying cases reimbursed at higher rates by commercial insurers. As a result, for this reason as well, anesthesia providers working in ASCs are not reasonably interchangeable with hospital-based providers. It would require higher than competitive payments that exceed the current compensation of ASC-based providers to attract them to practice at hospitals. But hospitals, who do not enjoy as high a proposition of higher paying commercial cases, cannot afford to do so.

86.   Alternatively, even if the market were determined to include anesthesia providers at outpatient centers and ASCs, the numbers of such providers are too small to provide meaningful alternative sources of care for any hospital.

87.   For hospitals, anesthesia groups with insufficient size or scope to provide 24-hour coverage or specialty anesthesia services cannot be reasonable substitutes for anesthesia groups providing services in hospitals. Groups serving only ASCs or other outpatient facilities are generally not of that size and scope.

## **Other Relevant Markets**

88.     Another relevant service market in this case is the market for facilities offering inpatient surgical services to commercially insured patients. This market encompasses a broad cluster of inpatient surgical services, including orthopedics, general surgery, cardiac and vascular surgery, gynecological surgery, urological surgery, spinal surgery, and neurosurgery. These services are offered to patients by the same set of hospital competitors and under similar competitive conditions.

89.     There is no substitute for inpatient services (which generally are defined to include at least one overnight stay in a hospital). Where an overnight stay is medically required, outpatient services are not an acceptable alternative. This is another cluster market, since all the included services are affected equally by the conduct described herein. Inpatient services are far more expensive, and as a result a procedure would not be done on an inpatient basis unless medically necessary.

90.     This market is a "cluster market", comprised of a number of different services, which do not necessarily substitute for one another. This group of services is typically defined as a cluster market in healthcare antitrust cases for convenience, because, the effects described herein apply equally to all these services.

91.     Another relevant service market in this case is the market for hospital facilities offering inpatient cardiac procedures to commercially insured patients. This market encompasses a cluster of cardiac procedures performed in the cardiac catheterization lab at a hospital, including diagnostic procedures (e.g., diagnostic cardiac catheterization and biopsy) and interventional procedures (e.g., TAVR and Watchmen procedures, balloon angioplasty, percutaneous coronary intervention), as well as electrophysiology procedures, such as atrial fibrillation ablations and installation of pacemakers. For those patients whose medical conditions

require these procedures, there are no reasonable substitutes for them. As a result, no managed care plan would offer insurance to patients that did not cover these procedures. These services are generally offered to patients by the same set of hospital competitors and under similar competitive conditions.

92.     Another relevant service market in this case is the market for obstetrical delivery services in hospitals. This market encompasses a cluster of services related to birth of a baby. Deliveries are generally performed in hospitals. While a few expectant mothers wish to have "natural" deliveries at home, this is very rare. There are therefore no good substitutes for the use of the hospital for delivery of a newborn for the vast majority of patients. These services are offered to patients by the same set of hospital competitors under similar competitive conditions.

93.     Another relevant service market encompasses hospital outpatient surgical services provided to commercially insured patients. This includes outpatient procedures performed in hospital facilities as well as procedures performed in other hospital-owned facilities. As described above, there are no substitutes for these services.

94.     Many patients prefer to utilize their hospitals and their facilities for outpatient as well as inpatient services because they know and trust the hospital brand. Many physicians located on hospital campuses prefer to refer their patients needing outpatient services to facilities on those campuses for convenience, and often prefer to refer their patients to hospital-owned facilities because they share common electronic medical records with the hospitals. It is also more convenient and efficient for physicians to perform their surgeries, including their outpatient surgeries, at the same locations as their inpatient surgeries.

95.     As a result, non-hospital facilities are not a substitute for hospitals for outpatient surgical care in health plans' networks. Health plan networks need to include hospital outpatient

surgical facilities in their networks to appeal to the significant number of patients who prefer those facilities, especially since employers seek networks which satisfy as many of their employees as possible. No health plan in Onondaga County has excluded hospital outpatient surgical services from a network in favor on non-hospital services.

96.     One study found that ASC entry did not have a significant impact on hospitals' outpatient surgical volume, indicating that patients do not see surgeries at ASCs as a substitute for surgeries at hospitals. Another study found that hospitals obtained much larger price increases than ASCs for the same outpatient procedures between 2007 and 2012. According to another study, outpatient procedures and services delivered in hospitals are often reimbursed at a higher rate than those delivered at a non-hospital setting.

97.     All of the service markets described above apply to services provided to commercially insured patients, because health care services provided to commercially insured patients are in a distinct market from those services when provided to other patients. Most insured consumers of health care are covered either by one of two government insurance programs (Medicare and Medicaid) or by private insurance organizations. The relevant markets do not include services paid for by Medicare or Medicaid, because these government programs fix their fees and therefore do not compete for these services. A hospital could not increase its volume or revenue by persuading patients to sign up for Medicare or Medicaid, because enrollment in these programs is limited to the elderly, disabled or underprivileged. Medicare and Medicaid typically pay significantly lower rates than do commercial insurers and, therefore, are not an alternative to them.

## Relevant Geographic Market for Anesthesia

98.     The relevant service markets described above are local. Because patients typically seek medical and hospital care close to home, they strongly prefer health insurance plans that

27

provide access to networks of hospitals and physicians close to home. Additionally, patients desire local hospitals that are in-network in their plan without financial penalties. Employers offering health insurance to their employees therefore demand insurance products that provide access to health care provider networks in all the areas in which substantial numbers of their employees live. Individuals purchasing individual health insurance likewise demand insurance products that provide access to health care provider networks, including hospitals, in the areas in which they live.

99.     The relevant geographic market for anesthesia services and employment of anesthesia providers is Onondaga County. Hospitals typically select anesthesia groups for hospital contracts in Onondaga County from groups with most of their providers located within Onondaga County. Anesthesia providers outside of Onondaga County are highly unlikely to be available to work full time at hospitals in Onondaga County because transportation conditions make daily travel for anesthesia care too costly and inconsistent. This is particularly true because anesthesia providers often need to be "on-call" for emergency surgical and heart procedures. They therefore need to be within a short distance of the hospital at which they work. The vast majority (approximately 80%) of Defendants' full time anesthesia providers at St. Joseph's reside in Onondaga County.

100.     Anesthesia providers are generally unwilling to move to a distant community in order to provide anesthesia care, especially in light of the numerous options they possess given the shortage of providers nationwide. Given the large number of anesthesia providers needed by hospitals, anesthesia practices based outside of Onondaga County are not reasonable substitutes for practices with substantial numbers of providers located in Onondaga County.

101.    There are not a significant number of anesthesia providers outside of Onondaga County who could be readily induced to practice in Onondaga County. The nearest hospitals to Onondaga County are 30 minutes' drive away, and are small hospitals that do not employ many anesthesiologists. The closest significant hospitals, employing large numbers of anesthesiologists, are in Binghamton, 75 miles away. Anesthesia providers based in Rochester would certainly not be able to commute to Syracuse, and even the limited number of providers in the smaller hospitals 30 minutes from Syracuse would not find a commute to Syracuse to be convenient. As a result, the available pool of anesthesia providers for Syracuse hospitals is effectively limited to the providers located in Onondaga County.

### Relevant Antitrust Geographic Market for Surgeries, Heart Procedures and Obstetric Procedures

102.    Onondaga County is a relevant geographic market in this case with respect to each relevant service market. Onondaga County includes the city of Syracuse and surrounding areas. Individuals living in Onondaga County and their employers seek local health care, including local hospitals, and demand that the leading hospitals in Onondaga County be included in their health insurance coverage as in-network providers. Only 4% of Onondaga County patients obtaining surgery utilize facilities outside of Onondaga County, and only 2% of hospital patients overall do so.

103.    The nearest hospital providing a sophisticated range of surgeries and heart procedures outside of Syracuse is in Binghamton, approximately 75 miles away. This is considerably farther than most patients would be willing to travel for such care.

104.    While there are other hospitals providing obstetric services that are closer to Onondaga County, Onondaga County residents have no reasonable substitutes for the availability of obstetrics procedures in Onondaga County. Most mothers in Onondaga County needing

obstetrics care would not utilize hospitals outside of the county for several reasons. First, these hospitals are at least a thirty minute drive from Syracuse. Given the urgency of some births, most mothers would not want to have to drive that distance in order to utilize a hospital for obstetric procedures. Second, the vast majority of OB/GYN physicians (who handle deliveries) practicing in Onondaga County do not have staff privileges, and do not deliver babies, at hospitals outside of Onondaga County. Nor would they do so, given the logistical difficulties of being available for deliveries at multiple hospitals at a significant distance from one another. Therefore, mothers utilizing these physicians would not utilize a hospital outside of the county. Additionally, most expectant mothers would not want to utilize an OB/GYN physician located in other communities thirty minutes or more from Syracuse, because of the inconvenience involved in multiple trips to such physicians' offices over the course of a pregnancy.

105.    A health insurer could not successfully sell health insurance products to employers with significant numbers of Onondaga County employees without including a choice of Onondaga County providers, including leading Onondaga County hospitals, in its network. As a result, there is no reasonable substitute for the Onondaga County hospitals for most patients in Onondaga County, for employers in Onondaga County or for managed care companies that offer their plans in Onondaga County.

### Monopoly Power

106.    It is especially difficult to attract new physicians to the Syracuse area. St. Joseph's and the other hospitals in the area have had difficulty in recruiting a wide range of specialty physicians to the community.

107.    Providing hospital-only anesthesia requires postsecondary education, including either a graduate post-medical degree or nursing degree, in addition to training and licensing. As

50448169.30

a result, the supply of anesthesia providers is limited and cannot be increased rapidly in response to market trends in demand or reimbursement rates.

108.   Recruitment of anesthesiologists is a slow process, requiring at least 12 to 18 months to successfully recruit an additional physician even where recruitment is possible. In addition, new anesthesia providers must spend time being oriented to the facility, equipment and surgeons or other proceduralists with whom they will work.

109.   There are four hospitals in Onondaga County, St. Joseph's, Crouse, Upstate Medical University and Upstate Community Hospital. Defendants provide anesthesia services at both St. Joseph's and Crouse, and all anesthesia at Upstate Medical University is provided by employed faculty members of the State University of New York. Upstate Community, which is a subsidiary of Upstate Medical University, receives anesthesia services from a small local anesthesia group, Community Hospital Anesthesia Group, which has less than 10 providers. As a result, St. Joseph's and Crouse do not have any ability to attract significant numbers of anesthesiologists or CRNAs who are currently working at other facilities in Onondaga County. Since there are no other significant hospitals within 80 miles of Syracuse, and given the significant shortage of anesthesiologists in upstate New York and nationwide and the other factors discussed above, there is no alternative source of anesthesiologists from which St. Joseph's or Crouse could readily recruit. Defendants thus have monopoly power in the relevant anesthesia services markets.

110.   Even if anesthesia providers serving ambulatory surgery centers were (improperly) included in the market, that would not change these conclusions. There are only a limited number of anesthesia providers serving freestanding ASCs in the market.

**<u>Anticompetitive Effects in the Relevant Anesthesia Markets</u>**

31

111.    The noncompetes and nonsolicitation clause have caused and will continue to cause substantial anticompetitive effects in the relevant anesthesia services market, since they serve to stymie competition and maintain Defendants' virtually complete monopoly. Enforcement of the noncompetes and nonsolicitation clause have and will continue to stymie St. Joseph's entry into competition in the relevant anesthesia services market by employing anesthesiologists and providing anesthesia services at its hospital. Enforcement of the noncompetes and nonsolicitation clause have therefore (and would in the future) maintain Defendants' monopoly power.

112.    The noncompetes and nonsolicitation clause are also unreasonable and harmful to competition because they interfere with patient choice, and prevent St. Joseph's physicians from utilizing their preferred anesthesiologists with whom they have developed long, successful working relationships.

113.    The noncompetes also prevent entry by other firms offering anesthesia services into the relevant market. There are many other firms nationwide that offer anesthesia services. But in order to offer services in a given local area, an anesthesia provider needs to be able to hire anesthesia providers who live in that area, since most anesthesia providers will not be willing to uproot their families and move to a distant city in order to continue to practice. Because the Defendants' anesthesia providers are precluded from becoming employed by other firms because of their noncompetes, entry into Onondaga County by other firms providing anesthesia care is effectively prohibited.

114.    Because of their enforcement of the noncompetes, Defendants have been able to harm the hospitals that purchase anesthesia services from them, including St. Joseph's, by demanding and receiving exorbitant and uncompetitive terms for the services they provide as

outlined above. This exercise of monopoly power has been made possible because of the noncompetes and nonsolicitation clause and Defendants' willingness to enforce them if necessary. If this enforcement continues, this exercise of monopoly power will continue, because St. Joseph's will have no real choice except to succumb to Defendants' demands.

115.     Defendants' recent refusal to "scale down" the supply of anesthesia providers to St. Joseph's amounts to an imposition of a significant price increase to St. Joseph's and has been possible only because of Defendants' monopoly power, which allows them to take such an action without any concern that St. Joseph's could turn to other sources for anesthesia care.

116.     The Federal Trade Commission's recent Notice of Proposed Rule Making with regard to a proposed rule to prohibit many noncompetition clauses provides evidence that physician noncompetition clauses can be significantly anticompetitive:

> [T]here is evidence non-compete clauses increase consumer prices and concentration in the health care sector.
>
> *          *          *
>
> [N]on-compete clauses foreclose the ability of competitors to access talent by effectively forcing future employers to buy out workers from their non-compete clauses if they want to hire them. Firms must either make inefficiently high payments to buy workers out of non-compete clauses with a former employer, which leads to deadweight economic loss, or forego the payment—and, consequently, the access to the talent the firm seeks. Whatever choice a firm makes, its economic outcomes in the market are harmed, relative to a scenario in which no workers are bound by non-compete clauses.

117.     The FTC's analysis applies precisely here. The enforcement of the noncompetes will force St. Joseph's to make artificially and inefficiently high payments to buy the anesthesiologists out of the noncompete clauses, pay exorbitant amounts to Defendants for inadequate services or forego access to these providers. This would create highly anticompetitive outcomes.

50448169.30

118.    St. Joseph's is a direct target of Defendants' actions. Defendants intend to enforce the noncompetes and nonsolicitation clause in order to prevent St. Joseph's from challenging Defendants' monopoly power in the relevant anesthesia markets. The harm to St. Joseph's is inextricably intertwined with this injury.

119.    Defendants are only taking their anticompetitive actions because their monopoly power gives them the ability to make these actions effective, and that same monopoly power gives them the incentive to enforce the clauses in order to prevent further competition. Enforcement of the noncompetes and nonsolicitation clause would not be effective in restricting competition or allowing Defendants to make exorbitant payment demands unless Defendants had market power.

120.    If it were not for Defendants' market power, they would not have the ability to effectively threaten enforcement of the noncompetes absent an exorbitant payment. They were able to make this demand and threat because they knew that St. Joseph's does not have alternatives to the anesthesia providers employed by Defendants. But for Defendants' market power and the anticompetitive effects identified herein, enforcement of the noncompetes and nonsolicitation clause would not cause the substantial damages alleged in this Complaint.

121.    Moreover, given the absence of any legitimate basis for the noncompetes or nonsolicitation clause, Defendants would not have an interest in enforcing the noncompete and nonsolicitation clause absent the market power and anticompetitive effects outlined herein.

**Anticompetitive Effects in the Relevant Surgery, Heart Procedure and Obstetric Markets**

122.    Enforcement of the noncompetes and nonsolicitation clause would also have significant anticompetitive effects in the relevant surgery, cardiac procedures and obstetrics markets. If St. Joseph's ended its relationship with Defendants in order to obtain more reasonably priced and better staffed anesthesia services, and the noncompete clause and

34

nonsolicitation clause were enforced, that would have the anticompetitive effect of diverting the vast majority of surgeries, cardiac procedures, and obstetrical deliveries from St. Joseph's,

123.    Since there are only three significant providers of those procedures in Onondaga County, St. Joseph's, Crouse and Upstate, a substantial reduction in the procedures performed by St. Joseph's, resulting in only two significant competitors in the market, would substantially reduce competition and increase concentration in the market.

124.    Under the Herfindahl-Hirschman Index ("HHI") test, a measure of market concentration set forth by the federal antitrust agencies in their Horizontal Merger Guidelines, competition is assessed by summing the squares of the market shares of the competitors. By that measure, the relevant markets are each "highly concentrated," defined by the federal antitrust agencies as markets with HHIs over 1,800.

125.    Defendants' enforcement of the noncompete provisions in their agreements with their anesthesia providers, coupled with the nonsolicitation clause, would further increase these already high levels of concentration in each of the relevant service markets by significantly reducing the role of St. Joseph's as a viable option for physicians and their patients. A market consisting only of Crouse and Upstate would involve HHI figures exceeding 5,000, far above the thresholds of concern. When markets are highly concentrated, even small shifts of patients from hospitals with smaller shares to hospitals with greater market shares can be anticompetitive.

126.    Numerous academic studies have concluded that when hospital markets become highly concentrated, with few competitors and high market shares, prices generally increase.

      a.    A 2011 study examined the effect of hospital market concentration on specific procedures. It found that in concentrated hospital markets, hospitals charged 29% more for cervical fusion, 31% more for lumbar

fusion, 45% more for total knee replacement, 49% more for total hip replacement, 50% more for angioplasty, and 56% more for CRM device insertion. James C. Robinson, *Hospital Market Concentration, Pricing, Profitability in Orthopedic Surgery and Interventional Cardiology,* 117(6) THE AM. J. OF MANAGED CARE e241, e244 (2011).

b. Another 2011 study examined the effect of concentrated hospital markets on hospital prices in 2001 and 2004. It concluded that "hospital prices are higher in more concentrated markets" and that a "1,000-percentage-point increase in the hospital concentration index raises prices by approximately 8.3 percent." Glenn A. Melnic, Yu-Chu Shen and Vivian Yaling Wu, *The Increased Concentration of Health Plan Markets Can Benefit Consumers through Lower Hospital Prices,* 30(9) Health Affairs 1728, 1729-31 (2011).

c. Another study of hospital mergers found that "[i]ncreases in hospital market concentration lead to increases in the price of hospital care." Martin Gaynor and Robert Town, The Impact of Hospital Consolidation—*Update,* Robert Wood Johnson Foundation, THE SYNTHESIS PROJECT (June 2012) at 1.

127. Enforcement of the noncompetes and nonsolicitation clause would also harm competition because it would require many patients to forego the choice of care at St. Joseph's, despite its extremely high quality, low cost services in each of the relevant markets. Diversion of cases away from St. Joseph's would deprive patients of the opportunity to benefit from these high quality and low cost services and suppress quality and price competition. Moreover, in

36

particular, to the extent that this diversion benefits Upstate, because of Upstate's high costs and high rates, further harm to competition is likely.

128.    This harm to competition in the relevant surgery, obstetric and heart procedure markets is inextricably intertwined with Defendants' demands. That is because St. Joseph's faces a "Hobson's choice." If it gives in to those demands, it would be forced to pay exorbitant rates for inadequate anesthesia staffing. If it does not, the noncompetes and nonsolicitation clauses would cause it to lose its only source of substantial anesthesia care, and therefore the loss of surgeries, heart procedures and other procedures described above. Its damages would also reflect the anticompetitive effects of Defendants' actions, because of the significant decrease in competition in these relevant markets that would result.

129.    In fact, Defendants intend that St. Joseph's face this Hobson's choice. Their leverage, and their ability to make unreasonable demands, arises because they know that the noncompetes and nonsolicitation clause preclude St. Joseph's from having any reasonable alternative source of anesthesia providers. Therefore, St. Joseph's is forced to either accept Defendants' demands or suffer significant loss of procedures requiring anesthesia.

**<u>Defendants' Noncompete Agreements and the Nonsolicitation Clause Do Not Provide Any Procompetitive Benefits and Do Not Serve a Reasonable Business Interest</u>**

130.    Defendants' noncompete agreements with the anesthesiologists and CRNAs practicing at St. Joseph's do not serve any reasonable business interest. They do not serve to protect any confidential information possessed by these providers, since none of the information possessed by them is at all confidential to Defendants. Defendants have not taken any steps to keep any information confidential. Defendants also have not claimed to St. Joseph's personnel that any of their information is confidential. Nor does the Agreement purport to protect (or even

address) the confidentiality of any information possessed by American Anesthesiology or other Defendants.

131.    Defendants do not possess any unique customer information or goodwill. The patients the anesthesiologists and CRNAs see are provided by the hospital. Defendants do not advertise their providers' services to prospective patients. Nor do they keep any confidential patient lists or have any hospital patients of their own.

132.    Defendants do not provide their anesthesia providers with significant specialized training. The anesthesiologists and CRNAs all receive specialized training before becoming employed by Defendants. Many of the practices were employed by other firms before NAPA took over the St. Joseph's practice.

133.    Defendants do not utilize any proprietary systems at St. Joseph's. Scheduling is performed by St. Joseph's. Defendants provide their services using industry standard technology. Defendants utilize scheduling software, but anesthesia scheduling software products are readily available for sale and St. Joseph's affiliates at Trinity Health already utilize such products.

134.    There are no procompetitive justifications for Defendants' actions. Even assuming, *arguendo*, and contrary to the allegations above, that the noncompetes provided some benefits to Defendants, they would not create any procompetitive effects in the relevant markets.

135.    For these reasons, while noncompetition clauses are common in physician contracts involving other specialties to protect against unfair appropriation of patient relationships, those justifications do not apply at all to anesthesia providers.

136.    All these conclusions apply equally to the nonsolicitation clause. Defendants' significant and repeated breaches of the Agreement's requirements regarding anesthesia staffing

are among the reasons why St. Joseph's has found it necessary to seek to employ the anesthesia providers.

137.   Harm to St. Joseph's from the enforcement of the noncompetes and nonsolicitation clause would be far less than the harm that Defendants would suffer if they were not able to employ these physicians. That is because (as described above) revenues involved in hospital treatment of patients for cases requiring anesthesia care far exceeds the revenues that involved in anesthesia care.

**Damages**

138.   St. Joseph's has suffered substantial damages because of Defendants' past utilization of their noncompetes to squelch competition, demand unreasonable payments, and force St. Joseph's to retain its relationship with American Anesthesiology despite the resulting significant understaffing and resulting loss of patients.

139.   The damages suffered by St. Joseph's due to NAPA's imposition of unreasonable terms equal at least $6 million.

**COUNT I**
**UNLAWFUL AGREEMENT IN VIOLATION OF**
**SHERMAN ACT § 1**
**Relevant Anesthesia Markets**

140.   St. Joseph's repeats and realleges the allegations of paragraphs 1 through 87, 98 through 121 and 130 through 139 above, as if fully restated herein.

141.   Each of the noncompete agreements between Defendants and their anesthesiologists and CRNAs, as well as the nonsolicitation clause, is a contract, combination, and conspiracy within the meaning of the Section 1 of the Sherman Act, 15 U.S.C. § 1.

142.   Defendants possess significant market power in the relevant anesthesia markets. This is demonstrated by their high market share, the high barriers to entry into the market, and

39

Defendants' ability to exclude competition by the use of their noncompetes and nonsolicitation clauses.

143.    The noncompete clauses and nonsolicitation clause have had, and if further enforced would continue to have, substantial and unreasonable anticompetitive effects in the relevant anesthesia markets as set forth above.

144.    The noncompete agreements and nonsolicitation clause therefore have, and threaten to continue to, unreasonably restrain trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

145.    As a direct and proximate result of Defendants' actual and threatened violations of Section 1 of the Sherman Act and the anticompetitive effects thereof, St. Joseph's has suffered and would continue to suffer substantial harm to its business and property.

**COUNT II**
**VIOLATIONS OF SECTION 2 OF THE SHERMAN ACT --**
**MONOPOLIZATION**
**Relevant Anesthesia Markets**

146.    St. Joseph's restates and realleges the allegations of paragraphs 1 through 87, 98 through 121 and 130 through 139, as if fully restated herein.

147.    Defendants possess and have possessed monopoly power in the relevant anesthesia markets. This is demonstrated by their high market share, the high barriers to entry into the market, and Defendants' ability to exclude competition by the use of their noncompetes and nonsolicitation clauses.

148.    Defendants' threatened actions described above have been and are being undertaken in order to maintain and enhance their monopoly power. These actions have achieved and threaten to continue to achieve that result. Enforcement of the noncompete clauses and nonsolicitation clause are exclusionary, because they prevent St. Joseph's from attempting to

compete for the services of Defendants' anesthesia providers or compete in the provision of anesthesia services at its hospital. These actions constitute unlawful monopolization in violation of Section 2 of the Sherman Act. 15 U.S.C. § 2.

149.    As a direct and proximate result of Defendants' actual and threatened violations of Section 2 of the Sherman Act, St. Joseph's has suffered and would continue to suffer injury to its business and property.

150.    As a direct and proximate result of Defendants' actual and threatened violations of Section 1 of the Sherman Act and the anticompetitive effects thereof, St. Joseph's has suffered and would continue to suffer substantial harm to its business and property.

**COUNT III**
**UNLAWFUL AGREEMENT IN VIOLATION OF**
**SHERMAN ACT § 1**
**Relevant Surgery, OB and Cardiac Procedure Markets**

151.    St. Joseph's repeats and realleges the allegations of paragraphs 1 through 139 above, as if fully restated herein.

152.    Each of the noncompete agreements between Defendants and their anesthesia providers, as well as the nonsolicitation clause, is a contract, combination, and conspiracy within the meaning of Section 1 of the Sherman Act, 15 U.S.C. § 1.

153.    Enforcement of the noncompete clauses and nonsolicitation clause have caused and threaten to cause substantial and unreasonable anticompetitive effects in each of the relevant surgery, cardiac procedures and obstetrics markets in Onondaga County as set forth above.

154.    The noncompete agreements and nonsolicitation clause therefore threaten to unreasonably restrain trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

155.    As a direct and proximate result of Defendants' threatened violations of Section 1 of the Sherman Act and the anticompetitive effects thereof, St. Joseph's has suffered and would continue to suffer injury to its business and property.

## COUNT IV
## VIOLATION OF DONNELLY ACT

156.    St. Joseph's repeats and realleges the allegations of paragraphs 1 through 155 above, as if fully restated herein.

157.    Defendants' actions occurred in and substantially affected New York's intrastate commerce, involving services provided by New York anesthesia providers, hospitals and doctors to patients in New York.

158.    Defendants' actions violate and threaten to continue to violate the Donnelly Act, New York General Business Law § 340 (2022).

159.    Defendants are not entitled to the learned professions exemption. Defendants' conduct is directed by, and motivated by, the for-profit goals of NAPA and its parent entities.

## COUNT V
## REQUEST FOR DECLARATORY JUDGMENT UNDER NEW YORK LAW

160.    St. Joseph's repeats and realleges the allegations of paragraphs 1 through 74 and 130 through 139 above, as if fully restated herein.

161.    In order to prove that a noncompete covenant or nonsolicitation clause is enforceable under New York law, Defendants must show: (i) the clause prevents unfair competition; (ii) the clause is otherwise reasonable; (iii) the clause is necessary to protect the plaintiff's confidential information or goodwill; and (iv) the clause is tailored to the situation. The noncompete and nonsolicitation clauses do not meet any of these requirements.

## COUNT VI
## BREACH OF CONTRACT

42

50448169.30

162.    St. Joseph's repeats and realleges the allegations of paragraphs 1 through 74 and 130 through 139 above, as if fully restated herein.

163.    Defendants' staffing failures described above constitute a breach of the Agreement, which has damaged St. Joseph's.

## **REQUEST FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Honorable Court:

a.      Require that Defendants release their employees practicing at St. Joseph's from any restrictions on their employment by St. Joseph's;

b.      Issue a declaratory judgment finding that Defendants' noncompetition clauses in their agreements with their physicians and CRNAs and the nonsolicitation clause in the Agreement violate federal and New York antitrust laws to the extent that they are utilized to prevent the anesthesiologists and CRNAs from becoming employed by St. Joseph's;

c.      Issue a declaratory judgment finding that Defendants' noncompetition clauses in their agreements with their anesthesiologists and CNRAs and the nonsolicitation clause in the Agreement are unreasonable and therefore unenforceable under New York law;

d.      Grant St. Joseph's three times its damages suffered as a result of Defendants' exploitation of their monopoly power resulting from their use of the noncompetes and nonsolicitation clause;

e.      Grant St. Joseph's its damages suffered as a result of Defendants' breach of contract;

f.      Award St. Joseph's its taxable costs and reasonable attorneys' fees; and

g.      Grant such other relief as this Court finds just.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury on all issues so triable.

Dated: February 26, 2024

s/John Queenan

John Queenan (Bar Roll No.513003)
Rivkin Radler LLP
66 S. Pearl Street, 11th floor
Albany, NY 12207
(518) 641-7071 (p)
(518) 462-4199 (f)
john.queenan@rivkin.com

s/David A. Ettinger

David A. Ettinger (P26537) (subject to pro hac application/admission)
Benjamin VanderWerp (P84614) (subject to pro hac application/admission)
Honigman LLP
2290 First National Building
660 Woodward Avenue
Detroit, MI 48226
(313) 465-7368 (p)
(313) 465-7369 (f)
dettinger@honigman.com
bvanderwerp@honigman.com

50448169.30