UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

---

ST. JOSEPH'S HOSPITAL HEALTH CENTER,

                Plaintiff,                5:24-cv-276 (BKS/ML)

v.

AMERICAN ANESTHESIOLOGY OF SYRACUSE,
P.C., AMERICAN ANESTHESIOLOGY, INC., NMSC II,
LLC, and NORTH AMERICAN PARTNERS IN
ANESTHESIA, L.L.P,

                Defendants.

---

AMERICAN ANESTHESIOLOGY OF SYRACUSE,
P.C., and NORTH AMERICAN PARTNERS IN
ANESTHESIA, L.L.P,

                Counter-Claimants,

v.

ST. JOSEPH'S HOSPITAL HEALTH CENTER,

                Counter-Defendant.

---

**Appearances:**

*For Plaintiff and Counter-Defendant:*
John F. Queenan
Rivkin Radler LLP
66 South Pearl Street, 11th Floor
Albany, New York 12207

David A. Ettinger
Benjamin VanderWerp
Honigman LLP
2290 First National Building
660 Woodward Avenue
Detroit, Michigan 48226

*For Defendants and Counter-Claimants:*
Jon P. Devendorf
J.J. Pelligra
Barclay Damon LLP
Barclay Damon Tower
125 East Jefferson Street
Syracuse, New York 13202

W. Scott O'Connell
Jennifer Lada
Marc L. Antonecchia
Holland & Knight LLP
31 West 52nd Street
New York, New York 10019

William M. Katz, Jr.
Holland & Knight LLP
One Arts Plaza
1722 Routh Street
Dallas, Texas 75201

**Hon. Brenda K. Sannes, Chief United States District Judge:**

## MEMORANDUM-DECISION AND ORDER

**I.    INTRODUCTION**

Plaintiff St. Joseph's Hospital Health Center initiated this action on February 26, 2024, against Defendants American Anesthesiology of Syracuse, P.C., American Anesthesiology of Syracuse, Inc., NMSC II, LLC, and North American Partners in Anesthesiology, L.L.P, asserting antitrust claims under the Sherman Act, 15 U.S.C. § 1 et seq., and New York law, N.Y. Gen. Bus. Law § 340. (Dkt. No. 1.) On March 7, 2024, Defendants answered the complaint and American Anesthesiology of Syracuse, P.C., and North American Partners in Anesthesiology, L.L.P (together, "NAPA"), asserted a counterclaim for breach of contract. (Dkt. No. 20.) The same day, NAPA moved by order to show cause for a temporary restraining order and preliminary injunction. (Dkt. Nos. 22–25.) The motion is fully briefed. (Dkt. Nos. 32, 38.) The

Court heard oral argument on the motion via telephonic conference on March 15, 2024. For the following reasons, NAPA's motion for a temporary restraining order is denied.

## II. FACTS[1]

### A. Parties

St. Joseph's operates a 431-bed hospital in Syracuse, New York, that offers "a variety of inpatient and outpatient services, including cardiology, obstetrics, surgery, and Level II trauma care." (Dkt. No. 32-3, ¶ 2; *see also* Dkt. No. 1, ¶¶ 8–9.) American Anesthesiology of Syracuse, P.C., is an affiliate of North American Partners in Anesthesia, LLP, which is an "anesthesia management company." (Dkt. No. 24, ¶ 3.) Both American Anesthesiology of Syracuse and North American Partners in Anesthesia are headquartered in Melville, New York. (Dkt. No. 20, at 20, ¶ 2–3.)

### B. Underlying Agreement

St. Joseph's and American Anesthesiology of Syracuse entered into an Administrative and Clinical Services Agreement (the "Agreement"), effective December 31, 2018. (Dkt. No. 24, ¶ 4; Dkt. No. 24-1.) The Agreement "establishe[d] an exclusive services arrangement between [St. Joseph's] and [American Anesthesiology of Syracuse] for the provision of anesthesiology services for patients of [St. Joseph's]," including the provision of anesthesiologists and certified

---

[1] The facts are taken from the complaint, the answer and counterclaims, and the affidavits and exhibits the parties submitted in connection with this motion. *See J.S.G. ex rel. J.S.R. v. Sessions*, 330 F. Supp. 3d 731, 738 (D. Conn. 2018) ("In deciding a motion for preliminary injunction, a court may consider the entire record including affidavits and other hearsay evidence."); *Fisher v. Goord*, 981 F. Supp. 140, 173 n.38 (W.D.N.Y. 1997) (noting that a "court has discretion on a preliminary injunction motion to consider affidavits . . . given the necessity of a prompt decision"). The "findings are provisional in the sense that they are not binding on a motion for summary judgment or at trial and are subject to change as the litigation progresses." *trueEX, LLC v. MarkitSERV Ltd.*, 266 F. Supp. 3d 705, 720 n.108 (S.D.N.Y. 2017); *see also Fair Hous. in Huntington Comm. Inc. v. Town of Huntington*, 316 F.3d 357, 364 (2d Cir. 2003). The Court's recitation of facts is limited to those relevant to the disposition of NAPA's motion for a temporary restraining order.

3

registered nurse anesthetists ("CRNAs" and, together with anesthesiologists, "clinicians"). (Dkt. No. 24-1, at 2–3; Dkt. No. 24, ¶ 3.)[2]

The Agreement's original term expired on December 31, 2020, with an automatic renewal for a period of two years unless either party gave notice 180 days or more before the expiration of the Agreement. (Dkt. No. 24-1, at 14.) Via multiple amendments, the Agreement term was extended to July 1, 2024. (Dkt. No. 24, ¶ 4; Dkt. Nos. 24-2, 24-3, 24-4.) On March 1, 2021, by Assignment and Assumption Agreement, American Anesthesiology of Syracuse assigned the Agreement (among other service contracts) to North American Partners in Anesthesia. (Dkt. No. 24, ¶ 5; Dkt. No. 24-5.)

The Agreement includes a non-solicitation clause, section XIII.D (the "Non-Solicitation Clause"), that reads in pertinent part:

> Employee Inducement. During the Term of this Agreement and for two (2) years from the date of termination of this Agreement, either Party will not directly or indirectly, whether as an individual, advisor, employee, agent, or otherwise take any action to induce any employee to cease his or her employment with the other Party.

(Dkt. No. 24-2, at 5.)[3]

### C. Relevant Conduct

On December 29, 2023, St. Joseph's informed NAPA that it would not renew the Agreement when the term ended on July 1, 2024. (Dkt. No. 32-3, ¶ 9.) During subsequent contract negotiations, NAPA representatives discussed the possibility of negotiating a buyout.

---

[2] In general, "the patients the anesthesia providers see are provided by the hospital." (Dkt. No. 32-2, ¶ 10.) "Anesthesia providers do not advertise their providers' services to prospective patients and do not admit their own patients to the hospital." (*Id.*) As to St. Joseph's specifically, "[a]nesthesiologists at St. Joseph's do not have relationships with patients, but instead are assigned patients as needed in light of the procedures being performed by [St. Joseph's] surgeons, cardiologists, OB/GYNs and other physicians which require anesthesia." (Dkt. No. 32-4, ¶ 9.)

[3] The Non-Solicitation Clause was present in the Agreement as originally contemplated. (Dkt. No. 24-1, at 17.) It was amended effective December 31, 2020, but the operative language was not meaningfully altered. (Dkt. No. 24-2, at 5.)

(Dkt. No. 32-7, ¶¶ 6, 8.) Negotiations were unsuccessful. (*Id.* ¶ 10.) St. Joseph's states that it is "imperative that [it] make arrangements to obtain anesthesia coverage in a short period of time, so that any physicians who are employed by St. Joseph's . . . can be properly credentialed and included in managed care contracts and approved by Medicare and Medicaid so that their services can be paid for." (Dkt. No. 32-7, ¶ 10.)

To that end, on February 26, 2024, St. Joseph's announced to its medical staff via email its intention to offer employment to "NAPA's anesthesia providers." (Dkt. No. 24-7.)[4] The same day, St. Joseph's sent offers of employment to "its anesthesia providers," (Dkt. No. 32-3, ¶ 10; Dkt. No. 32-7, ¶ 11; Dkt. No. 24-9),[5] and filed its complaint, (Dkt. No. 1). On March 1, 2024, NAPA sent St. Joseph's a cease-and-desist letter demanding that St. Joseph's refrain from inducing NAPA's clinicians to terminate their contracts with NAPA. (Dkt. No. 25-1.) St. Joseph's responded by letter dated March 5, 2024. (Dkt. No. 25-2.)[6] NAPA subsequently filed its answer and counterclaim, (Dkt. No. 20), and, contemporaneously, the instant motion, (Dkt. Nos. 22–25).

## III. DISCUSSION

### A. Standard of Review

Rule 65 of the Federal Rules of Civil Procedure governs the issuance of temporary restraining orders and preliminary injunctions. In the Second Circuit, the standard for issuance of a temporary restraining order is the same as the standard for a preliminary injunction. *Fairfield*

---

[4] St. Joseph's acknowledged the Non-Solicitation Clause and other restrictive covenants in this email and indicated that it was "suing to have those [restrictive covenants] declared void and to obtain damages based on NAPA's past behavior." (*Id.*)

[5] The offers of employment also acknowledged existing restrictive covenants. (Dkt. No. 24-9, at 3.)

[6] St. Joseph's requested in this letter "an estimate of the cost" associated with "the benefit of funds [NAPA] has expended in clinical training of [NAPA's clinicians]." (*Id.* at 2.)

*Cnty. Med. Ass'n v. United Healthcare of New Eng.*, 985 F. Supp. 2d 262, 270 (D. Conn. 2013), *aff'd*, 557 F. App'x 53 (2d Cir. 2014) (summary order); *AFA Dispensing Grp. B.V. v. Anheuser-Busch, Inc.*, 740 F. Supp. 2d 465, 471 (S.D.N.Y. 2010) ("It is well established that the standard for an entry of a temporary restraining order is the same as for a preliminary injunction."). In general, a party seeking a preliminary injunction must demonstrate: (1) a likelihood of irreparable injury in the absence of an injunction; (2) a likelihood of success on the merits or sufficiently serious questions going to the merits to make them fair ground for litigation; (3) that the balance of hardships tips in the movant's favor or, if relying on the presence of sufficiently serious questions, that the balance of hardships tips *decidedly* in the plaintiff's favor; and (4) that the public interest would not be disserved by the issuance of an injunction. *Benihana, Inc. v. Benihana of Tokyo, LLC*, 784 F.3d 887, 895 (2d Cir. 2015); *see also N. Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc.*, 883 F.3d 32, 37 (2d Cir. 2018).

Generally, preliminary injunctions are prohibitory or mandatory. *N. Am. Soccer League*, 883 F.3d at 36. "Prohibitory injunctions maintain the status quo pending resolution of the case; mandatory injunctions alter it." *Id.* The "status quo . . . is[] 'the last actual, peaceable uncontested status which preceded the pending controversy.'" *Id.* at 37 (quoting *Mastrio v. Sebelius*, 768 F.3d 116, 120 (2d Cir. 2014) (per curiam)). A party seeking a mandatory injunction "must meet a heightened legal standard by showing 'a clear or substantial likelihood of success on the merits.'" *Id.* (quoting *N.Y. Civ. Liberties Union v. N.Y.C. Transit Auth.*, 684 F.3d 286, 294 (2d Cir. 2012)). "A heightened 'substantial likelihood' standard may also be required when the requested injunction (1) would provide the plaintiff with 'all the relief that is sought' and (2) could not be undone by a judgment favorable to defendants on the merits at trial."

6

*Mastrovincenzo v. City of New York*, 435 F.3d 78, 90 (2d Cir. 2006) (quoting *Tom Doherty Assocs., Inc. v. Saban Ent., Inc.*, 60 F.3d 27, 33–34 (2d Cir. 1995)).

St. Joseph's does not contend that the injunctive relief NAPA seeks is mandatory rather than prohibitory.[7] Rather, St. Joseph's argues that "an injunction would provide NAPA with substantially all the relief it seeks, and that relief could not be undone." (Dkt. No. 32, at 16.) NAPA did not address this argument in its briefing.[8] At oral argument, NAPA admitted that injunctive relief would provide it with substantially all the relief it seeks. The Court agrees that it appears injunctive relief would provide NAPA "with substantially all the relief sought," *see Tom Doherty Assocs.*, 60 F.3d at 34, and given St. Joseph's unopposed argument that an "immediate injunction would make it impossible for St. Joseph's to employ the clinicians because the hospital needs to complete its employment negotiations with these individuals by the end of March," (Dkt. No. 32, at 15–16; *see also* Dkt. No. 32-7, ¶ 10), it appears in this context that an order, once complied with, could not be undone and that the "substantial likelihood of success" standard applies. Even applying the less demanding "likelihood of success" standard, however, NAPA has failed to meet its burden on the record presently before the Court.

B. **Analysis**

1. **Irreparable Harm**

NAPA argues that, in the absence of injunctive relief, they face "financial harm"—which NAPA argues is "challenging to model and calculate" and therefore irreparable—associated with NAPA's "[in]ability to relocate its anesthesiologists and CRNAs to another hospital where NAPA affiliated entities have an exclusive contract to provide anesthesia services" and the

---

[7] Because the relief sought would appear to maintain the status quo—that is, the "the last actual, peaceable uncontested status which preceded the pending controversy"—the Court assumes the injunction is prohibitory. *See N. Am. Soccer League*, 883 F.3d at 37 (quoting *Mastrio*, 768 F.3d at 120).

[8] NAPA addresses only the distinction between prohibitory and mandatory injunctions. (Dkt. No. 38, at 5–6.)

7

danger that "St[.] Joseph's actions and the dysfunction that this litigation will foist into the work environment may cause anesthesiologists and CRNAs to seek employment with another non-NAPA provider." (Dkt. No. 23, at 13.) NAPA also argues that St. Joseph's actions "threaten to fracture or even disintegrate the cohesive group of NAPA's 16 employed anesthesiologists and 35 employed CRNAs that focus on providing highly-specialized anesthesiology services to St. Joseph's patients" and that the "loss of these medical professionals threatens NAPA's ability to conduct its business in a way that is not quantifiable by money damages." (*Id.*) Finally, NAPA argues that "there are immediate concerns with respect to how St. Joseph's actions are affecting patient care" because "[c]onfusion and anxiety about the impact that St. Joseph's actions have on . . . [the] ability [of anesthesiologists and CRNAs employed by NAPA] to care for patients, and questions about how the litigation will affect their employment, certainly raise[] the prospect that patient safety is being compromised. (*Id.* at 13–14.) St. Joseph's argues that "break[ing] apart" NAPA's clinician group is not a cognizable injury, mere disruption of NAPA's business does not constitute irreparable harm, the harms alleged by NAPA are speculative, and any injuries are compensable through money damages. (Dkt. No. 32, at 24–26 (quoting Dkt. No. 24, ¶¶ 15–18).) St. Joseph's has submitted declarations from three doctors who work at St. Joseph's who have not seen evidence that the clinicians' patient care has been compromised. (Dkt. No. 32-8, ¶ 5; Dkt. No. 32-9, ¶ 4; Dkt, No. 32-10, ¶ 5.)

     A showing of irreparable harm is "the single most important prerequisite for the issuance of a preliminary injunction," *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009) (quoting *Rodriguez ex rel. Rodriguez v. DeBuono*, 175 F.3d 227, 234 (2d Cir. 1999)); *see also Doe v. Rensselaer Polytechnic Inst.*, No. 18-cv-1374, 2019 WL 181280, at *2, 2019 U.S. Dist. LEXIS 5396, at *4 (N.D.N.Y. Jan. 11, 2019), and "[i]n the absence of a showing

of irreparable harm, a motion for a preliminary injunction should be denied," *Rodriguez*, 175 F.3d at 234. "Irreparable harm is 'injury that is neither remote nor speculative, but actual and imminent and that cannot be remedied by an award of monetary damages.'" *New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 660 (2d Cir. 2015) (quoting *Forest City Daly Hous., Inc. v. Town of N. Hempstead*, 175 F.3d 144, 153 (2d Cir. 1999)). "The relevant harm is the harm that (a) occurs to the parties' legal interests and (b) cannot be remedied after a final adjudication, whether by damages or a permanent injunction." *Salinger v. Colting*, 607 F.3d 68, 81 (2d Cir. 2010) (footnote omitted).

As an initial matter, NAPA's argument that patient care may be impacted is speculative and conclusory. NAPA bases its argument on Dr. Kenneth M. Santos's factual assertion that he has "learned that surgeons and other professionals in the surgical suite at St. Joseph's are . . . concerned, confused and anxious over how St. Joseph's actions will impact their ability to treat patients" and "about how this litigation will impact their employment" and that Dr. Santos is therefore "concerned that St. Joseph's actions and all of these dynamics are sufficiently upsetting and distracting that patient safety is being compromised." (Dkt. No. 24, ¶ 14.) This is speculative and conclusory and therefore provides an insufficient basis on which to establish irreparable harm. *See T-Mobile Ne. LLC v. Riverhead Water Dist.*, No. 15-cv-6310, 2016 WL 373968, at *3, 2016 U.S. Dist. LEXIS 10652, at *8 (E.D.N.Y. Jan. 29, 2016).[9]

As to NAPA's remaining arguments—those related to "financial harm" arising from NAPA's inability to relocate clinicians, NAPA's clinicians seeking employment elsewhere, and "disintegrat[ion] [of] the cohesive group" of NAPA clinicians that would "threaten[] NAPA's

---

[9] Dr. Santos's speculation is also contradicted by declarations from doctors and administrators at St. Joseph's who work with the clinicians. (Dkt. No. 32-3, ¶ 13; Dkt. No. 32-4, ¶ 11; Dkt. No. 32-8, ¶ 5; Dkt. No. 32-9, ¶ 4; Dkt. No. 32-10, ¶ 5.)

9

ability to conduct its business," (Dkt. No. 23, at 13)—NAPA fails to demonstrate how the potential loss of clinicians to St. Joseph's is not compensable through money damages. "It is settled law that when an injury is compensable through money damages there is no irreparable harm." *JSG Trading Corp. v. Tray-Wrap, Inc.*, 917 F.2d 75, 79 (2d Cir. 1990). And "[l]oss of business due to a breach of a [restrictive covenant] is often a quantifiable injury which can be remedied at law." *Banner Indus. of N.E., Inc. v. Wicks*, No. 11-cv-1537, 2012 WL 13018976, at *6 (N.D.N.Y. May 8, 2012) (collecting cases).

In support of its position that money damages could not remedy the harm caused by St. Joseph's actions, NAPA cites *Veramark Technologies., Inc. v. Bouk*, 10 F. Supp. 3d 395, 401 (W.D.N.Y. 2014). (Dkt. No. 38, at 13.) But in *Veramark*, the court found that the party moving for a preliminary injunction had failed to demonstrate irreparable harm because the alleged irreparable harms at issue—the threat to "customer relationships and goodwill" and the loss of a "unique" employee—were not supported by facts in the record. *See* 10 F. Supp. 3d 395, 401–05. The court in *Veramark* did not specifically discuss whether money damages might be adequate, and *Veramark* therefore does not support NAPA's argument that money damages, in this specific instance, would be inadequate.[10] NAPA cites no other case to demonstrate that money damages—the calculation of which appears relatively straightforward—could not remedy an injury caused by St. Joseph's actions.

---

[10] The court in *Veramark* did note that, "[b]ecause it is very difficult to calculate monetary damages in the event of the loss of a *client relationship* 'that would produce an indeterminate amount of business in years to come,' the violation of an *enforceable* non-compete constitutes irreparable harm." *Id.* at 400 (emphasis added) (quoting *Ticor Title Ins. Co. v. Cohen*, 173 F.3d 63, 69 (2d Cir.1999)). As an initial point, the alleged harm here does not involve a difficult-to-quantify client relationship but instead involves competition for employees, and in any case, as the Court discusses below, NAPA has failed to meet its burden, at this stage of the case, of showing a likelihood of success. Furthermore, the court in *Veramark* went on to say that "irreparable harm may not be presumed and must be demonstrated in each case." 10 F. Supp. 3d at 401. On this record, NAPA has not demonstrated that money damages are insufficient to remedy the alleged harm.

At bottom, NAPA has not, on the record before the Court, met its burden of demonstrating irreparable harm because the harms it alleges appear to amount to "[m]ere business disruptions," *see Harley Marine NY, Inc. v. Moore*, No. 23-cv-163, 2023 WL 3620720, at *6, 2023 U.S. Dist. LEXIS 92265, at *17 (N.D.N.Y. Mar. 24, 2023), that are compensable by money damages, *see Banner*, 2012 WL 13018976, at *6 ("[The] [p]laintiff has not shown that any business lost . . . could not be calculated with reasonable certainty."); *TGG Ultimate Holdings, Inc. v. Hollett*, No. 16-cv-6289, 2016 WL 8794465, at *5, 2016 U.S. Dist. LEXIS 188014, at *12 (S.D.N.Y. Aug. 29, 2016) ("Considering that [the plaintiff] is a large company with operations across the United States, and its services . . . are not 'so unique that any alleged damages resulting from its inability to market and sell them could not be easily quantified,' . . . any harm . . . may be remedied by money damages." (quoting *Park W. Radiology v. Carecore Nat'l LLC*, 240 F.R.D. 109, 113 (S.D.N.Y. 2007)); *DS Parent, Inc. v. Teich*, No. 13-cv-1489, 2014 WL 546358, at *13, 2014 U.S. Dist. LEXIS 16116, at *44 (N.D.N.Y. Feb. 10, 2014) (denying a preliminary injunction where "money damages would . . . be relatively easy to prove and would likely adequately compensate [the plaintiff] for its loss").

    **2.**    **Likelihood of Success or Sufficiently Serious Questions**

NAPA argues that it is likely to succeed on the merits of its breach of contract claim because the Agreement, including the Non-Solicitation Clause, is an enforceable contract with St. Joseph's, and St. Joseph's has breached the Agreement by failing to comply with the Non-Solicitation Clause. (Dkt. No. 23, at 10–12.) St. Joseph's argues that NAPA is not likely to succeed on the merits of its breach of contract claim because (1) the Non-Solicitation Clause is not enforceable under New York law; (2) performance of the Agreement should be excused; and (3) the Non-Solicitation Clause violates federal antitrust law. (Dkt. No. 32, at 16–24.)

11

As set forth above, it appears that NAPA must establish a substantial likelihood of success on the merits to obtain preliminary injunctive relief. "To establish a likelihood of success on the merits, a plaintiff must show that he is more likely than not to prevail on his claims, or, in other words, that the 'probability of prevailing is better than fifty percent.'" *Doe v. Vassar Coll.*, No. 19-cv-9601, 2019 WL 6222918, at *7, 2019 U.S. Dist. LEXIS 203418, at *20 (quoting *BigStar Ent., Inc. v. Next Big Star, Inc.*, 105 F. Supp. 2d 185, 191 (S.D.N.Y. 2000)). To the extent NAPA did not have to establish a substantial likelihood of success, it could prevail by showing "a serious question going to the merits to make them a fair ground for trial, with a balance of hardships tipping decidedly in the plaintiff's favor." *Id.*, 2019 WL 6222918, at *7, 2019 U.S. Dist. LEXIS 203418, at *21 (quoting *Metro. Taxicab Bd. of Trade v. City of New York*, 615 F.3d 152, 156 (2d Cir. 2010)). This allows a district court to grant injunctive relief "where it cannot determine with certainty that the moving party is more likely than not to prevail on the merits of the underlying claims, but where the costs outweigh the benefits of not granting the injunction." *See Citigroup Glob. Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 35 (2d Cir. 2010).

"Under New York law, a breach of contract claim requires proof of (1) an agreement, (2) adequate performance by the [claimant], (3) breach by the [other party], and (4) damages." *Fischer & Mandell, LLP v. Citibank, N.A.*, 632 F.3d 793, 799 (2d Cir. 2011) (citing *First Invs. Corp. v. Liberty Mut. Ins. Co.*, 152 F.3d 162, 168 (2d Cir. 1998)).[11] "In pleading these elements, a [claimant] must identify what provisions of the contract were breached as a result of the acts at issue." *Adecco USA, Inc. v. Staffworks, Inc.*, No. 20-cv-744, 2020 WL 7028872, at *4, 2020 U.S.

---

[11] The parties do not dispute that New York law applies, and in any event, the Agreement specifies that it is governed by the "laws of the State where the services are to be performed," (Dkt. No. 24-1, at 20), and services provided pursuant to the Agreement are indisputably performed in Syracuse, New York, (Dkt. No. 24, ¶ 3; Dkt. No. 32-3, ¶¶ 2, 6).

Dist. LEXIS 226382, at *11 (N.D.N.Y. Sept. 15, 2020) (quoting *Wolff v. Rare Medium, Inc.*, 171 F. Supp. 2d 354, 358 (S.D.N.Y. 2001)). NAPA premises its breach of contract claim solely on the Non-Solicitation Clause. (Dkt. No. 20, at 23–24, ¶ 21.) NAPA must therefore show that this restrictive covenant is enforceable in order to demonstrate a likelihood of success on its claim. *See Intertek Testing Servs., N.A., Inc. v. Pennisi*, 443 F. Supp. 3d 303, 333 (E.D.N.Y. 2020). Accordingly, the Court turns to the enforceability of the Non-Solicitation Clause.

"Courts analyze restrictive covenants in ordinary commercial contracts . . . 'under a simple rule of reason, balancing the competing public policies in favor of robust competition and freedom to contract.'" *Mathias v. Jacobs*, 167 F. Supp. 2d 606, 611 (S.D.N.Y. 2001) (quoting *DAR & Assocs., Inc. v. Uniforce Servs., Inc.*, 37 F. Supp. 2d 192, 197 (E.D.N.Y. 1999)). "Courts typically consider the legitimate business interests protected by the covenant, the reasonableness of the covenant, and the degree of hardship imposed upon the party against whom the covenant is enforced." *Id.* (citing *DAR*, 37 F. Supp. 2d at 198–200). A restrictive covenant is reasonable if it: "(1) is no greater than is required for the protection of the legitimate interest of the employer, (2) does not impose undue hardship on the employee, and (3) is not injurious to the public." *BDO Seidman v. Hirshberg*, 93 N.Y.2d 382, 388–89 (1999).[12] "[C]ognizable employer interests" include "protection against misappropriation of the employer's trade secrets or of confidential customer lists, or protection from competition by a former employee whose services are unique

---

[12] NAPA argues for the first time in its reply brief that, under New York law, there is a distinction between a court's analysis of restrictive covenants in employment contracts and restrictive covenants as components of "ordinary commercial contracts" between "sophisticated parties." (Dkt. No. 38, at 6–7 (citing *Mathias*, 167 F. Supp. 2d at 610–11). As to the latter, NAPA argues, the "simple rule of reason" applies. (*Id.* (quoting *Mathias*, 167 F. Supp. 2d at 611).) But under the standard espoused by the cases NAPA cites for that proposition, the Court must still consider whether there are "legitimate business interests protected by the covenant." *See Mathias*, 167 F. Supp. 2d at 611; *accord DAR*, 37 F. Supp. 2d at 197. Whether such interests are the same as those enumerated in *BDO Seidman* is not well-settled. *See MasterCard Int'l Inc. v. Nike, Inc.*, 164 F. Supp. 3d 592, 599–600 (S.D.N.Y. 2016). But multiple courts have applied the *BDO Seidman* factors in analyzing contractual provisions in similar contexts. *See id.* at 600 (collecting cases and applying *BDO Seidman*). Accordingly, the Court considers the *BDO Seidman* factors in applying the "rule of reason" identified by NAPA.

or extraordinary." *See id.* at 389; *accord Ticor*, 173 F.3d at 70 ("[E]nforcement will be granted to the extent necessary (1) to prevent an employee's solicitation or disclosure of trade secrets, (2) to prevent an employee's release of confidential information regarding the employer's customers, or (3) in those cases where the employee's services to the employer are deemed special or unique." (citing *Purchasing Assocs. v. Weitz*, 13 N.Y.2d 267, 272–73 (1963))).

Here, NAPA argues that "enforcement of the covenant is reasonable to enforce NAPA's legitimate business interest because of the considerable effort the NAPA Parties expend in identifying, hiring, and retaining qualified anesthesiologists and CRNAs." (Dkt. No. 23, at 10–11.) NAPA clarifies in its reply brief that its legitimate business interest is protection against "the unfair conversion of NAPA's trained and in place workforce at St. Joseph's" through the "poaching [of] the high-quality, well-trained, in-place workforce that NAPA has assembled though significant time, effort, and opportunity costs." (Dkt. No. 38, at 7.)[13] St. Joseph's argues that the Non-Solicitation Clause does not protect a legitimate business interest. (Dkt. No. 32, at 16–20.)

NAPA's contention that it has expended "considerable effort . . . in identifying, hiring, and retaining qualified anesthesiologists and CRNAs" finds only limited factual support in the record. Chelsea Gifford, NAPA's Talent Acquisition Manager for its Northeast Region, indicates NAPA's recruitment records for St. Joseph's show that "NAPA was able to cultivate and recruit 301 separate clinician applications for its practices in Syracuse" and that "of that total, offers for St. Joseph's positions were extended to 39; and signed contracts were received from 24." (Dkt. No. 38-2, ¶ 7.) Dr. Santos states that he "devotes significant time to recruiting clinicians to the

---

[13] NAPA does not argue that the Non-Solicitation Clause prevents solicitation or disclosure of trade secrets, confidential or otherwise private information, or client information.

practice," that "[o]ther NAPA clinicians do as well," that recruitment "is a near daily obligation," and that "the time NAPA clinicians devote to recruiting is not reimbursed by St. Joseph's." (Dkt. No. 38-3, ¶ 6.) But NAPA provides no argument or caselaw support as to how these discrete recruitment records establish a legitimate business interest in NAPA maintaining its current clinicians. Nor does NAPA argue how Dr. Santo's vague assertions about time spent on recruitment do so.

Moreover, "protection against a general risk of possible future employee attrition is not among the . . . legitimate interests recognized by New York courts to justify a restrictive covenant." *Reed Elsevier Inc. v. Transunion Holding Co.*, No. 13-cv-8739, 2014 WL 97317, at *12, 2014 U.S. Dist. LEXIS 2640, at *32–33 (S.D.N.Y. Jan. 9, 2014) (collecting cases). In its memorandum of law in support of its motion for a temporary restraining order, NAPA cites a single in-circuit[14] case to argue otherwise. (Dkt. No. 23, at 11–12.)[15] But that case stands for the

---

[14] NAPA also cites a trial-court decision from North Carolina, (Dkt. No. 23, at 12), which does not apply New York law and is therefore unpersuasive. Furthermore, that case relied in part on evidence in the record demonstrating that the plaintiff had not only recruited but also "credential[ed] and train[ed]" anesthesiologists, *see Se. Anesthesiology Consultants, PLLC v. Charlotte-Mecklenburg Hosp. Auth.*, No. 18-cv-5899, 2018 WL 3304441, at *22, 2018 NCBC LEXIS 137, *68 (N.C. Super. June 22, 2018), while NAPA argues only that its legitimate interest is in "identifying, hiring, and retaining qualified anesthesiologists and CRNAs," (Dkt. No. 23, at 12). Indeed, St. Joseph's presented evidence that "[a]nesthesia providers all receive specialized training *before* becoming employed, in medical school, in residencies and in CRNA programs," and that "[c]ontinuing medical education in anesthesia care is widely available from a variety of firms." (Dkt. No. 32-2, ¶ 11 (emphasis added).)

[15] In a footnote in its reply brief, NAPA cites additional cases. (Dkt. No. 38, at 7 n.1.) None of these cases supports the proposition that NAPA's interest in maintaining its currently constituted workforce is a legitimate business interest protectable by a restrictive covenant. Instead, the cases demonstrate that other interests, such as protection of confidential or otherwise private business information, information related to a business's clients, or significant investment in training and developing the skills of its employees may entitle a business to enforcement of a restrictive covenant. *See DAR*, 37 F. Supp. 2d at 199 ("[A business] possesses an interest in its *know-how*, *client base*, [*private list of*] *temporary employees*, and *goodwill* that warrants some protection through restrictive covenants." (emphasis added)); *Spherenomics Glob. Contact Centers v. vCustomer Corp.*, 427 F. Supp. 2d 236, 249 (E.D.N.Y. 2006) ("In the instant case, the legitimate business interest to be preserved is the unfair competition that would result from [the defendant] independently pursuing business opportunities with *a client* to whom [the plaintiff] had introduced it for the purpose of the joint pursuit." (emphasis added) (citing *DAR*, 37 F. Supp. 2d at 199)); *Design Strategy Corp. v. Knack Sys., LLC*, No. 07-cv-395, 2007 WL 4562926, at *4, 2007 U.S. Dist. LEXIS 94121, at *9 (S.D.N.Y. Dec. 18, 2007) ("There would be unfairness here if, in the face of the restrictive covenant, [the defendant] exploited [the plaintiff's] relationship with [*a client*] to obtain its own business, but not otherwise."); *Marsh USA Inc. v. Karasaki*, No. 08-cv-4195, 2008 WL 4778239, at *14, 2008 U.S. Dist. LEXIS 90986, at *43 (S.D.N.Y. Oct. 31, 2008) ("The departure of [the plaintiff's] employees deprives [the plaintiff] not only of its *investment in training and developing*

15

proposition that a restrictive covenant is enforceable where the defendant "was attempting to poach [the plaintiff's] employees in the hopes of replicating [the plaintiff's] developed [information security] network." *See MasterCard*, 164 F. Supp. 3d at 602. The court in *MasterCard* recognized that "poaching employees" is a "legitimate interest[] recognized by courts in New York" insofar as the underlying intent is that the employees "bring proprietary information with them." *See id.* (quoting *Admarketplace Inc. v. Salzman*, No. 651390/2013, 2014 WL 1278504, at *4, 2014 N.Y. Misc. LEXIS 1458, at *10 (N.Y. Sup. Ct. Mar. 28, 2014)). In enforcing the restrictive covenant, therefore, *MasterCard* relied not on investment in identifying, hiring, and retaining employees—nor on any "special or unique" skillsets or abilities of employees—but rather the "confidential information" or "trade secrets, " *see BDO Seidman*, 93 N.Y.2d at 389; *Ticor*, 173 F.3d at 70, that those employees possessed. *See MasterCard*, 164 F. Supp. 3d at 602 ("[T]he merit of Plaintiff's allegations that NIKE was attempting to poach MasterCard's employees in the hopes of replicating MasterCard's developed IS network will be borne out in discovery.").[16]

---

those employees, but also . . . of those employees' *clients* who follow the employees because of the relationships developed with them at [the plaintiff's] expense." (emphasis added)). Here, there is no confidential or otherwise private business information or client information at issue, and there is no evidence in the record on which the Court could conclude that NAPA has significantly invested in training its clinicians.

[16] While NAPA does not specifically argue the point, and is not clear that such considerations are relevant where the parties are not medical professionals competing for patients but are instead "an anesthesia management company" and a hospital competing for employees, (Dkt. No. 24, ¶ 3; Dkt. No. 32-3, ¶ 2), New York courts do afford "learned professionals," including medical professionals, "wider latitude" with respect to enforceability of restrictive covenants. *See BDO Seidman*, 93 N.Y.2d at 389–90 (citing, inter alia, *Gelder Med. Grp. v. Webber*, 41 N.Y.2d 680 (1977)). But the "test of reasonableness" demands analysis of "the particular facts[] and circumstances giving context to the agreement," *id.* at 390, and NAPA has proffered no facts—such as "the uniqueness or extraordinary nature of the . . . [specific] services . . . performed" or "any unique or extraordinary ability [providing] a competitive advantage"—on which the Court could rely in determining that the Non-Solicitation Clause is "necessary to protect [NAPA's] legitimate interests" under *BDO Seidman*. *See id.* at 389–90; *see also Ticor*, 173 F.3d at 70 ("Services that are not simply of value to the employer, but that may also truly be said to be special, unique or extraordinary may entitle an employer to injunctive relief."). Indeed, one New York court has found that "[t]he anesthesia services at issue herein are not unique" and are seemingly "routinely performed." *See Gujral v. Anesthesia Grp. of Albany, P.C.*, 201 N.Y.S.3d 920, 2023 WL 9285382, at *2, 2023 N.Y. Misc. LEXIS 23444, at *9 (N.Y. Sup. Ct. Dec. 20, 2023) (table); (Dkt. No. 32-2, ¶ 3; Dkt. No. 32-4, ¶¶ 2, 10).

16

Accordingly, on this record the Court concludes that NAPA has failed to provide evidence and caselaw supporting its claim of a likelihood of success or sufficiently serious questions going to the merits to make them fair ground for litigation with respect to their breach of contract claim.[17]

### 3. Balance of Hardships and Public Interest

"[T]he balance of hardships inquiry asks which of the two parties would suffer most grievously if the preliminary injunction motion were wrongly decided." *Goldman, Sachs & Co. v. Golden Empire Schs. Fin. Auth.*, 922 F. Supp. 2d 435, 444 (S.D.N.Y. 2013) (alteration in original) (quoting *Tradescape.com v. Shivaram*, 77 F. Supp. 2d 408, 411 (S.D.N.Y. 1999)). Furthermore, "the court must ensure that the 'public interest would not be disserved' by the issuance of a preliminary injunction." *Salinger*, 607 F.3d at 80.

NAPA's failure to demonstrate an irreparable injury and either a likelihood of success on the merits or sufficiently serious questions going to the merits is sufficient to deny injunctive relief. *See Salinger*, 607 F.3d at 75 n.5; *Faiveley*, 559 F.3d at 119. Accordingly, the Court need not consider the remaining balance of hardships and public interest factors. *Conn. State Police Union v. Rovella*, 36 F.4th 54, 68 (2d Cir. 2022) ("Because the District Court did not err in concluding that the [plaintiff] could not succeed on the merits of its claim, we need not address the remaining prongs of the preliminary injunction test, including whether the [plaintiff] demonstrated irreparable harm or whether an injunction would be in the public interest.").

## IV. CONCLUSION

For these reasons, it is hereby

---

[17] Because the Court's analysis with respect to the enforceability of the Non-Solicitation Clause provides a basis on which the Court concludes that NAPA has not demonstrated that it is likely to succeed on its breach of contract claim, the Court does not address, at this juncture, St. Joseph's arguments that performance of the Agreement should be excused or that the Non-Solicitation Clause violates federal antitrust law.

17

**ORDERED** that NAPA's motion for a temporary restraining order, (Dkt. No. 22), is **DENIED**; and it is further

**ORDERED** that briefing of NAPA's motion for a preliminary injunction shall proceed in accordance with the schedule discussed at oral argument on NAPA's motion for a temporary restraining order, (Text Minute Entry dated 3/15/2024): St. Joseph's may respond to NAPA's latest submission by 3/22/2024, NAPA may reply by 3/27/2024, and a hearing is set for 4/15/2024 at 9:30 a.m.[18]

**IT IS SO ORDERED.**

Dated: March 19, 2024
Syracuse, New York

*Brenda K. Sannes*
Brenda K. Sannes
Chief U.S. District Judge

---

[18] The Court will determine whether an evidentiary hearing is necessary after reviewing the parties' supplemental submissions.