**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

ST. JOSEPH'S HOSPITAL HEALTH CENTER,

                              Plaintiff,               5:24-cv-276 (BKS/ML)

v.

AMERICAN ANESTHESIOLOGY OF SYRACUSE,
P.C., AMERICAN ANESTHESIOLOGY, INC., NMSC II,
LLC, and NORTH AMERICAN PARTNERS IN
ANESTHESIA, L.L.P,

                              Defendants.

AMERICAN ANESTHESIOLOGY OF SYRACUSE,
P.C., AMERICAN ANESTHESIOLOGY, INC., NMSC II,
LLC, and NORTH AMERICAN PARTNERS IN
ANESTHESIA, L.L.P,

                              Counter-Claimants,

v.

ST. JOSEPH'S HOSPITAL HEALTH CENTER,

                              Counter-Defendant.

**Appearances:**

*For Plaintiff and Counter-Defendant:*
John F. Queenan
Rivkin Radler LLP
66 South Pearl Street, 11th Floor
Albany, New York 12207

David A. Ettinger
Benjamin VanderWerp
Honigman LLP
2290 First National Building
660 Woodward Avenue
Detroit, Michigan 48226

*For Defendants and Counter-Claimants:*
Jon P. Devendorf
J.J. Pelligra
Barclay Damon LLP
Barclay Damon Tower
125 East Jefferson Street
Syracuse, New York 13202

W. Scott O'Connell
Jennifer Lada
Marc L. Antonecchia
Holland & Knight LLP
787 Seventh Ave., 31st Floor
New York, New York 10019

William M. Katz, Jr.
Holland & Knight LLP
One Arts Plaza
1722 Routh Street
Dallas, Texas 75201

**Hon. Brenda K. Sannes, Chief United States District Judge:**

## MEMORANDUM-DECISION AND ORDER

## I.    INTRODUCTION

Plaintiff St. Joseph's Hospital Health Center ("St. Joseph's") initiated this action on

February 26, 2024, against Defendants American Anesthesiology of Syracuse, P.C., American

Anesthesiology, Inc., NMSC II, LLC, and North American Partners in Anesthesiology, L.L.P.

(together, "NAPA"), asserting antitrust claims under the Sherman Act, 15 U.S.C. § 1 et seq. and

the Donnelly Act, N.Y. Gen. Bus. Law § 340 as well as a breach of contract claim. (Dkt. No. 1.)

Defendants subsequently filed counterclaims alleging breach of contract, tortious interference

with contract, and claims for injunctive and declaratory relief. (Dkt. No. 53).[1] Presently before

---

[1] Defendants originally answered the Complaint and asserted a counterclaim for breach of contract on March 7, 2024. (Dkt. No. 20). After Plaintiff filed a motion to dismiss the counterclaims, (*see* Dkt. No. 45), Defendants filed an Amended Answer and Counterclaims, (Dkt. No. 53). Plaintiff subsequently withdrew its motion to dismiss, (Dkt. No. 56), and filed a motion to dismiss the amended counterclaims, (Dkt. No. 57).

the Court is Plaintiff's motion to dismiss counterclaims pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, (Dkt. No. 57), and Defendants' partial motion to dismiss Plaintiff's antitrust claims for monetary damages for lack of standing, (Dkt. No. 77). The motions are fully briefed. (Dkt. Nos. 57-1, 64, 68, 77-1, 79–80). For the following reasons, the Court grants in part and denies in part Plaintiff's motion to dismiss counterclaims and denies Defendants' partial motion to dismiss.

## II.    FACTS[2]

### A.    Parties

Plaintiff St. Joseph's operates a 431-bed hospital in Syracuse, New York, that offers "a variety of inpatient and outpatient services, including cardiology, obstetrics, surgery, and Level II trauma care." (Dkt. No. 1, ¶¶ 8–9).

Defendant American Anesthesiology of Syracuse, P.C. is "the exclusive provider of anesthesia care at St. Joseph's and at Crouse Health, one of the other two hospitals in Onondaga County." (*Id.* ¶ 13). Defendant American Anesthesiology, Inc. is the parent corporation of American Anesthesiology of Syracuse. (*Id.* ¶ 14). Both entities are headquartered in Melville, New York. (*Id.* ¶¶ 13–14). Defendant NMSC II, LLC, a Delaware limited liability company, is the parent corporation of American Anesthesiology, Inc. (*Id.* ¶ 15). NMSC is a subsidiary of Defendant North American Partners in Anesthesia, L.L.P., a New York limited liability partnership, also based in Melville, New York that employs 5,000 clinicians and provides services at 400 facilities nationwide in 22 states, making it the "largest anesthesia services provider in North America." (*Id.* ¶ 16).

---

[2] The facts are drawn from the Complaint, (Dkt. No. 1), and the Amended Counterclaims, (Dkt. No. 53). In evaluating each "motion to dismiss, the Court accepts as true all well-pleaded factual allegations and draws all reasonable inferences in favor of the non-moving party." *Howard v. Carter*, 615 F. Supp. 3d 190, 193 (W.D.N.Y. 2022) (citing *Hooks v. Forman, Holt, Eliades & Ravin, LLC*, 717 F.3d 282, 284 (2d Cir. 2013)).

### B. Underlying Agreement

St. Joseph's and American Anesthesiology of Syracuse entered into an Administrative and Clinical Services Agreement (the "Agreement"), effective December 31, 2018. (Dkt. No. 53, ¶ 6, at 21). The Agreement "established an exclusive services arrangement between St. Joseph's and [American Anesthesiology of Syracuse] for the provision of anesthesiology services for St. Joseph's patients," including anesthesiologists and certified registered nurse anesthetists ("CRNAs"). (*Id.*; Dkt. No. 1, ¶ 2). Under the original Agreement, St. Joseph's was to pay "a negotiated subsidy for Clinical and Administrative Services," (Dkt. No. 24-1, at 9), and under the amended agreements, St. Joseph's paid a "Fixed Administrative Fee." (Dkt. No. 24-2, at 15; Dkt. No. 24-3, at 8).[3]

On March 1, 2021, by an Assignment and Assumption Agreement, American Anesthesiology of Syracuse assigned the Agreement to North American Partners in Anesthesia. (Dkt. No. 53, ¶ 3, at 20). The parties extended the Agreement several times, until St. Joseph's sent a notice of nonrenewal on December 29, 2023 such that the contract was set to expire on July 1, 2024. (*Id.* at ¶ 7, at 21; Dkt. No. 1, ¶ 32).

The Agreement includes a non-solicitation clause, section XIII.D, that reads in pertinent part:

> During the Term of this Agreement and for two (2) years from the date of termination of this Agreement, either Party will not directly or indirectly, whether as an individual advisor, employee, agent, or

---

[3] Although a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) is typically confined to the pleadings, the Court is permitted to consider "any statements or documents incorporated in [the complaint] by reference" so long as the complaint "make[s] a clear, definite and substantial reference to the document." *Smith v. Adidas Am. Inc.*, 691 F. Supp. 3d 564, 573 (N.D.N.Y. 2023). Here, the Complaint and Amended Counterclaims incorporate the Agreement as the basis for the underlying dispute and significantly discuss specific clauses of the Agreement and subsequent amendments. (*See* Dkt. No. 1, ¶¶ 17–18, 20, 32–33, 35, 40, 42–43, 49, 51, 54, 72–73; Dkt. No 53 ¶¶ 6–24, at 21–25). Neither party disputes that these were the underlying agreements. As such, it is proper for the Court to consider the Agreement and subsequent amendments.

> otherwise take any action to induce any employee to cease his or her
> employment with the other Party.

(Dkt. No. 53, ¶ 8, at 21).[4]

### C.    Relevant Conduct

On December 29, 2023, St. Joseph's informed NAPA that it would not renew the

Agreement when the term ended on July 1, 2024. (Dkt. No. 1, ¶ 64). During subsequent contract

negotiations, NAPA representatives discussed the possibility of negotiating a buyout. (*Id.* ¶ 65–

67). Negotiations, however, were unsuccessful. (*Id.* ¶ 70.) St. Joseph's states that it would have

been "faced with a critical shortfall in anesthesia care" if not for seeking to employ Defendants'

anesthesiologists and CRNAs, which would have "seriously harm[ed] patients" and forced St.

Joseph's to "face an impossible financial situation that would not allow it to remain in

operation." (*Id.* ¶¶ 56, 58).

To that end, "to avoid these staffing and payment problems, and because of its inability to

obtain reasonable terms from Defendants," St. Joseph's offered employment to NAPA's

anesthesiologists and CRNAs (together, "Clinicians"), effective on expiration of the Agreement.

(*Id.* ¶ 72). On February 26, 2024, St. Joseph's issued an email to its medical staff stating its

intention to offer employment,[5] delivered offer letters to NAPA-employed clinicians, and filed

the present lawsuit. (Dkt. No. 53, ¶¶ 48–49, at 31).

On March 1, 2024, NAPA sent St. Joseph's a cease-and-desist letter demanding that St.

Joseph's refrain from inducing the Clinicians to terminate their contracts with NAPA. (*Id.* ¶ 50,

---

[4] The non-solicitation clause was present in the Original Agreement (Dkt. No. 53, ¶ 8, at 21). Section XIII.D was subsequently amended, but "the amendment maintained and reaffirmed St. Joseph's obligation not to directly or indirectly take any action to induce any employee of the Group to cease their employment with NAPA." (*Id.* ¶ 11, at 22).

[5] St. Joseph's indicated in this email that it was suing for alleged violations of federal and state antitrust law. (Dkt. No. 53, ¶ 48, at 31).

at 31). St. Joseph's did not rescind the offers of employment in response to the cease-and-desist. (*Id.*). At least "some" NAPA clinicians had accepted St. Joseph's employment offer as of April 18, 2024. (*Id.*).

### III.    PLAINTIFF'S MOTION TO DISMISS COUNTERCLAIMS UNDER RULE 12(b)(6)

#### A.    Standard of Review

To survive a motion to dismiss under Rule 12(b)(6) for failure to state a claim, "a complaint must provide 'enough facts to state a claim to relief that is plausible on its face.'" *Mayor & City Council of Balt. v. Citigroup, Inc.*, 709 F.3d 129, 135 (2d Cir. 2013) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Mere "labels and conclusions" are insufficient; rather, a plaintiff must provide factual allegations sufficient "to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. The Court must "accept all factual allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff." *E.E.O.C. v. Port Auth.*, 768 F.3d 247, 253 (2d Cir. 2014) (citing *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007)). Additionally, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

The same standards apply to a motion to dismiss a counterclaim as to a motion to dismiss a complaint, with pleadings "construed 'in the light most favorable to [the counter-claimant], resolving all doubts in [the counter-claimant's] favor.'" *Zurich Am. Life Ins. Co. v. Nagel*, 571 F. Supp. 3d 168, 175 (S.D.N.Y. 2021) (alterations in original). "[C]ounterclaims must meet the pleading requirements of Rule 8(a), as interpreted by *Twombly* and *Iqbal*, in order to survive a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6)." *Erickson Beamon Ltd. v. CMG Worldwide, Inc.*, No. 12-cv-5105, 2014 WL 3950897, at *7, 2014 U.S. Dist. LEXIS

112437, at *18 (S.D.N.Y. Aug. 12, 2014) (citing *Orientview Techs. LLC v. Seven for All Mankind, LLC*, No. 13-cv-0538, 2013 WL 4016302, at *2, 2013 U.S. Dist. LEXIS 111107, at *5–6 (S.D.N.Y. Aug. 7, 2013) ("A motion to dismiss a counterclaim is evaluated under the same standard as a motion to dismiss a complaint.")).

### B.    Discussion

Pursuant to Rule 12(b)(6), Plaintiff seeks to dismiss Defendants' counterclaims for (1) breach of contract, (2) injunctive relief stemming from the breach of contract, (3) declaratory relief requiring St. Joseph's to indemnify NAPA for attorneys' fees and costs in connection with this lawsuit, and (4) tortious interference with contractual relations. (Dkt. No. 57).

### 1.    Breach of Contract

"Under New York law, a breach of contract claim requires proof of (1) an agreement, (2) adequate performance by the [claimant], (3) breach by the [other party], and (4) damages." *Fischer & Mandell LLP v. Citibank, N.A.*, 632 F.3d 793, 799 (2d Cir. 2011).[6] With respect to the first element, NAPA must demonstrate that the restrictive covenants are enforceable. *Testing Servs., N.A. v. Pennisi*, 443 F. Supp. 3d 303, 333 (E.D.N.Y. 2020). As this Court previously stated:

> "Courts analyze restrictive covenants in ordinary commercial contracts . . . 'under a simple rule of reason, balancing the competing public policies in favor of robust competition and freedom to contract.'" *Mathias v. Jacobs*, 167 F. Supp. 2d 606, 611 (S.D.N.Y. 2001) (quoting *DAR & Assocs., Inc. v. Uniforce Servs., Inc.*, 37 F. Supp. 2d 192, 197 (E.D.N.Y. 1999)). "Courts typically consider the legitimate business interests protected by the covenant, the reasonableness of the covenant, and the degree of hardship imposed upon the party against whom the covenant is enforced." *Id.* (citing *DAR*, 37 F. Supp. 2d at 198–200). A restrictive covenant is

---

[6] "The parties do not dispute that New York law applies, and in any event, the Agreement specifies that it is governed by the 'laws of the State where the services are to be performed,'" and this dispute concerns services performed in Syracuse, New York. *St. Joseph's Hosp. Health Ctr. v. Am. Anesthesiology of Syracuse, P.C.*, No. 5:24-cv-276, 2024 WL 1181136, at *5, n.11, 2024 US Dist. LEXIS 47891, at *14, n.11 (N.D.N.Y. Mar. 19, 2024).

> reasonable if it: "(1) is no greater than is required for the protection of the legitimate interest of the employer, (2) does not impose undue hardship on the employee, and (3) is not injurious to the public." *BDO Seidman v. Hirshberg*, 93 N.Y.2d 382, 388–89 (1999). "[C]ognizable employer interests" include "protection against misappropriation of the employer's trade secrets or of confidential customer lists, or protection from competition by a former employee whose services are unique or extraordinary." *See id.* at 389.

*St. Joseph's Hosp. Health Ctr. v. Am. Anesthesiology of Syracuse, P.C.*, No. 5:24-cv-276, 2024 WL 1181136, at *6, 2024 US Dist. LEXIS 47891, at *14–15 (N.D.N.Y. Mar. 19, 2024).

NAPA argues that it has "put St. Joseph's on notice as to the basis of NAPA's claims" such that the motion to dismiss is premature and the merits of the counterclaim should be assessed at a later stage of the litigation. (Dkt. No. 64, at 8). In so arguing, NAPA misconstrues *Twombly* as a set of "notice obligations." (*Id.*). Even if the allegations put the other party on notice and are taken as true, if they "could not raise a claim of entitlement to relief, 'this basic deficiency should be . . . exposed at the point of minimum expenditure of time and money by the parties and the court.'" *Twombly*, 550 U.S. at 558. Therefore, it is appropriate for the Court to consider whether NAPA has plausibly alleged that there was an enforceable non-solicitation clause.

NAPA argues that there is a "distinction between employer-employee covenants and covenants between sophisticated parties, like St. Joseph's and NAPA, that are incident to a legitimate business transaction." (Dkt. No. 64, at 10). Indeed, the Second Circuit has recognized the difference between a "restrictive covenant preventing an employee from pursuing his livelihood" and an "anti-raiding provision in a commercial agreement between two sophisticated parties." *Omni Consulting Group, Inc. v. Pilgrim's Pride Corp.*, 488 F. App'x 478, 480 (2d Cir. 2012). Because of this distinction, NAPA notes that "the law is unclear as to whether the *BDO Seidman* test applies" to non-solicitation clauses as opposed to just non-compete clauses. (Dkt.

No. 64, at 17 n.2). To this end, some New York courts have found that where "the parties simply agreed not to hire away employees from one another," "the analysis is not the same as . . . a restrictive covenant in an employment agreement." *Gibbs & Soell, Inc. v. Armstrong World Indus.*, No. 04-cv-5103, 2005 WL 615688, at *4, 2005 U.S. Dist. LEXIS 4004, at *12 (S.D.N.Y. Mar. 17, 2005). Nevertheless, though non-recruitment clauses are "inherently more reasonable and less restrictive" than non-compete clauses, *see Renaissance Nutrition, Inc. v. Jarrett,* No. 08-cv-800, 2012 WL 42171, at *5, 2012 U.S. Dist. LEXIS 2490, at *15 (W.D.N.Y. Jan. 9, 2012), courts considering the issue have applied *BDO Seidman*'s three-prong test. *See Reed Elsevier v. TransUnion Holding Co., Inc.*, No. 13-cv-8739, 2014 WL 97317, at *7, 2014 U.S. Dist. LEXIS 2640, at *18 (S.D.N.Y. Jan. 8, 2014) ("Courts applying New York law have observed that there is a dearth of case law addressing no-hire provisions, and consequently apply the same three-prong analysis applied to non-compete clauses to determine the reasonableness of no-hire provisions."); *MasterCard Int'l Inc. v. Nike, Inc.*, 164 F. Supp. 3d 592, 600 (S.D.N.Y. 2016) ("This Court is persuaded that the reasonableness test set forth in *BDO Seidman* applies to non-recruitment provisions.").

As such, courts still inquire into the reasonableness of the specific non-recruitment clause, which requires an analysis of whether the agreement supports a legitimate business interest. *See Spherenomics Global Contact Ctrs. v. vCustomer Corp.*, 427 F. Supp. 2d 236, 249 (E.D.N.Y. 2006); *Genesee Val. Trust Co. v. Waterford Group, LLC*, 130 A.D.3d 1555, 1557–59 (4th Dep't 2015). In the specific context of employment contracts preventing employees from soliciting other employees, courts have found a legitimate business interest "in the protection of client relationships developed at the employer's expense" and "in maintaining its client base." *Renaissance Nutrition, Inc.*, 2012 WL 42171, at *3–5, 2012 U.S. Dist. LEXIS 2490, at *9–15;

*see also Reed Elsevier, Inc.*, 2014 WL 97317, at *8, 2014 U.S. Dist. LEXIS 2640, at *22 ("New York courts have recognized four legitimate interests that may be asserted to support a restrictive covenant: (1) protection of trade secrets, (2) protection of confidential customer information, (3) protection of the employer's client base, and (4) protection against irreparable harm where the employee's services are unique or extraordinary."); *Oliver Wyman, Inc. v. Eielson*, 282 F. Supp. 3d 684, 694 (S.D.N.Y. 2017) (analyzing whether there was a legitimate business interest under the four stated interests in *Reed Elsevier, Inc.*).

Here, NAPA does not allege that the non-solicitation clause protects trade secrets, confidential customer information, or a client base. (*See* Dkt. No. 53). Rather, NAPA alleges that the clause protects: NAPA's goodwill from investments and training in its clinicians that "make its clinicians uniquely valuable and desirable," (*id.* ¶ 42, at 29), and NAPA's goodwill from the relationships that NAPA has with the doctors and other professionals who perform surgeries at St. Joseph's, who NAPA refers to as its "customers." (*Id.* ¶ 27, at 26). NAPA alleges that without the non-solicitation clause, "hospitals can take all the value that was created by and belongs to NAPA." (*Id.* ¶ 42, at 29). St. Joseph's argues that "NAPA has not alleged any legitimate business interest protected by the Non-Solicitation Clause, and therefore, the clause is not enforceable." (Dkt. No. 57-1, at 10).

Following the Court's ruling denying NAPA's motion for a preliminary injunction, *St. Joseph's Hosp. Health Ctr.*, 2024 WL 1181136, 2024 US Dist. LEXIS 47891, NAPA filed its opposition to the instant motion citing, *inter alia*, for the first time the case of *Omni Consulting Group, Inc. v. Marina Consulting, Inc.*, No 01-cv-511A, 2007 WL 2693813, at *5 (W.D.N.Y. Sept. 12, 2007), *aff'd sub nom. Omni Consulting Group, Inc.*, 488 F. App'x 478 in support of its argument that the non-solicitation clause is supported by a "readily apparent" legitimate business

interest. (Dkt. No. 64, at 13). The Court finds *Omni* and its Second Circuit affirmance to be most analogous and persuasive here.

In *Omni*, the defendant organization was "in the business of providing consulting personnel to its clients" and "locat[ed] and train[ed] (if necessary) and match[ed] personnel to meet the needs of its clients." 2007 WL 2693813, at *5. The district court considered the parties' non-solicitation clause to be "analogous to typical anti-raiding contracts between corporate entities," which are distinguishable from "individual employment contracts containing restrictive covenants." *Id.* at *4. The court did, nevertheless, analyze the provision under "a simple rule of reason," and considered "(1) whether the plaintiff has demonstrated a legitimate business interest that warrants the enforcement of the covenant; (2) the reasonableness of the covenant in terms of scope and duration; and (3) the degree of hardship enforcement of the covenant would inflict upon [the defendant]." *Id.* at *5. The court found the plaintiff's legitimate business interest to be "readily apparent." *Id.* If the partnering organizations "were free to directly hire the personnel provided by Omni, and thus bypass paying Omni a fee for locating and placing the personnel, Omni would not be able to maintain its business." *Id.* With respect to hardship, the court noted that the defendant "does not argue that the enforcement of the provision would pose a hardship to [it] (other than the fact that it would have had to pay Omni the rate it agreed to pay . . . in the [agreement])" and that the non-solicitation clause did "not impact [the defendant's] ability to maintain its business." *Id.* The court, however, found the lack of any temporal restriction "troublesome" and, using the terms of a master underlying agreement, imputed a one-year temporal restriction into the agreement to render it reasonable. *Id.* at *6.

The Second Circuit affirmed the district court's decision, enforcing what it referred to as an "anti-raiding provision in a commercial agreement between two sophisticated parties." *Omni*

*Consulting Group, Inc.*, 488 F. App'x at 480. The Circuit also affirmed the district court's reasonableness analysis, finding that "in the circumstances" of the case, "where the master agreement contained a one-year restriction," it was reasonable for the district court to limit the non-solicitation restriction to one year. *Id.*

Here, NAPA argues that without the non-solicitation clause, hospitals could directly hire NAPA's clinicians and bypass NAPA's fee for locating and placing them, which would put NAPA out of business, like the business in *Omni*. (Dkt. No. 64, at 13). St. Joseph's contends that *Omni* is inapposite, because it "involved a claim of the theft of trade secrets." (Dkt. No. 68, at 3). While *Omni* did involve such a claim, that claim was not at all relevant to the analysis of the breach of contract claim. *See* 2007 WL 2693813, at *4–7. St. Joseph's also argues, without explanation or citation, that *Omni* "is contrary to the prevailing three part standard under New York law." (Dkt. No. 68, at 3). The district court in *Omni*, however, did consider a three-factor standard of reasonableness, including whether enforcement of the provision would pose a hardship. 2007 WL 2693813, at *5–7. Other courts evaluating the reasonableness of non-solicitation clauses between sophisticated parties have similarly considered whether a party was "coerced into agreeing to [the] covenant," "'lacked any meaningful choice' with regard to accepting it," or faced "any hardship" because of it. *See Spherenomics Global Contact Ctrs.*, 427 F. Supp. 2d at 250. Although the business interest recognized in *Omni* is not one of the legitimate business interests identified in *BDO Seidman* or the cases involving employee non-solicitation clauses, *Omni* is clearly analogous here.

The Court recognizes that here, unlike in *Omni*, there are allegations that the non-solicitation clause posed a hardship. The Complaint alleges that all of the NAPA clinicians who work at St. Joseph's are bound by noncompete clauses. (Dkt. No. 1, ¶ 2). While these clinicians

12

"play critical roles in the care of patients in every hospital," there is a nationwide shortage of anesthesia providers. (Dkt. No. 1, ¶¶ 26, 30). The Complaint further alleges that "St. Joseph's critically needed the anesthesia care provided by Defendants, and had no alternatives due to the noncompetes[.]" (*Id.* ¶ 43). NAPA allegedly had "the power to effectively shut off anesthesia services at St. Joseph's" if St. Joseph's did not conform with NAPA's monetary demands. (*Id.* ¶ 49). Because there were "no adequate substitutes," St. Joseph's was "forced . . . to accept the unreasonable terms demanded by" NAPA. (*Id.* ¶¶ 59-61). St. Joseph's alleges that NAPA used the noncompetes to "squelch competition, demand unreasonable payments, and force St. Joseph's to retain its relationship with American Anesthesiology despite the resulting significant understaffing and resulting loss of patients," (*id.* ¶ 138), unreasonably restraining trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1 and constituting unlawful monopolization in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2, (*id.* ¶¶ 140–155).

Whether the non-solicitation clause at issue here was reasonable will rest "on the particular facts and circumstances giving context to the agreement." *Reed Elsevier, Inc.*, 2014 WL 97317, at *7, 2014 U.S. Dist. LEXIS 2640, at *19 (quoting *BDO Seidman*, 93 N.Y.2d at 390). At this early stage, however, because NAPA has plausibly alleged a legitimate business interest under *Omni*, the Court denies St. Joseph's motion to dismiss NAPA's counterclaim for breach of contract.[7]

---

[7] The counterclaim does not appear to plausibly allege that NAPA has a legitimate business interest in protecting the goodwill of a client or customer. In general, an entity has a "legitimate interest" in protecting "the goodwill of a client or customer, which had been created and maintained at the [entity's] expense[.]" *BDO Seidman*, 93 N.Y.2d at 392. This interest exists to "forestall unfair competition," *id.* at 391, when "there is a substantial risk that the [breaching party] may be able to divert all or part of the [entity's] business," *Ticor Title Ins. Co. v. Cohen*, 173 F.3d 63, 72 (2d Cir. 1999), because "customers are likely to follow." *Natsource LLC v. Paribello*, 151 F. Supp. 2d 465, 469 (S.D.N.Y. 2001). St. Joseph's argues that NAPA's "customers" are the patients who paid NAPA for the anesthesiology services and there is no allegation that the clause protects any goodwill NAPA created with patients. (Dkt. No. 57-1 at 12). NAPA alleges that the non-solicitation clause protects NAPA's goodwill in its "customer relationships" with the physicians and healthcare professionals at St. Joseph's. (Dkt. No. 53, ¶¶ 27–33, at 26–27). However, in light of this ruling, the Court does not consider the sufficiency of NAPA's allegations that the non-solicitation clause protects

2.    **Indemnification**

NAPA's third counterclaim seeks a declaration that "St. Joseph's must indemnify NAPA under Section XIV.A. of the Agreement and that St. Joseph's must pay NAPA's reasonable attorneys' fees and costs in connection with this lawsuit." (Dkt. No. 53, ¶ 68, at 34). The indemnification clause at issue states in full:

> Indemnification for Administrative Services. Hospital will indemnify, defend and hold harmless Group and Physician from and against all liability, claims, losses, damages and expenses, including reasonable legal fees and expenses, arising from their acts and omissions in the performance of the Services, excluding gross negligence and/or willful misconduct.

(Dkt. No. 24-1, at 17). St. Joseph's argues, *inter alia*, that the indemnity claim must be dismissed because the language is not "unmistakably clear" that St. Joseph's promised to indemnify NAPA in an action between the parties. (Dkt. No. 57-1, at 19–20). The Court agrees.

Under New York law, "[w]hen a party is under no legal duty to indemnify, a contract assuming that obligation must be strictly construed to avoid reading into it a duty which the parties did not intend to be assumed." *Hooper Associates, Ltd. v. AGS Computers, Inc.*, 74 N.Y.2d 487, 491 (1989). Indeed, "[t]he promise should not be found unless it can be clearly implied from the language and purpose of the entire agreement and the surrounding facts and circumstances." *Id.* at 491–92. This means that a court should not impose this duty unless it "is unmistakably clear from the language of the promise" that the parties intended for that duty to be included in the contract. *Id.* at 492. Where the subject of the indemnification provision could be "susceptible to third-party claims" and is not "exclusively or unequivocally referable to claims

---

NAPA's goodwill in its "customer relationships" or goodwill arising from "investments and training." (*Id.* ¶¶ 34–46, at 27–30).

Because NAPA's second counterclaim is for injunctive relief stemming from the alleged breach of contract (*Id.* ¶¶ 58–63, at 33–34), and the Court finds that NAPA plausibly alleged breach of contract, the Court denies Plaintiff's motion to dismiss the second counterclaim as well.

between the parties themselves," it is less likely that the parties intended to indemnify one another in actions against the other. *Id.* Furthermore, if other provisions in the contract, such as a notice requirement, "unmistakably relate to third-party claims," the court should not infer intent to "waive the benefit of" the "well-understood rule that parties are responsible for their own attorney's fees[.]" *Id.* at 492–93 (finding that a clause requiring "plaintiff to 'promptly notify' defendant of 'any claim or litigation to which the indemnity set forth in [the indemnity provision] shall apply'" would be "meaningless" if the indemnification clause applied to the suit between parties "because the requirement of notice . . . has no logical application to a suit between the parties").

NAPA argues that the subject of the administrative services indemnification provision "could only arise in a dispute between St. Joseph's and NAPA, not third-parties." (Dkt. No. 64, at 20). Although the Agreement does not define "administrative services," NAPA alleges that "administrative services" includes "billing, collection, negotiation, credentialing/privileging, financial reporting, accounting, compliance, human resources, and recruiting services." (Dkt. No. 53, ¶ 21, at 24). St. Joseph's does not challenge this definition. (Dkt. No. 57-1, at 19). At minimum, because NAPA billed patients directly for professional services provided by its clinicians, (*see* Dkt. No. 24-1, at 30), it is plausible that a third-party suit could be brought against NAPA for a billing problem, which would make third-party suits under the administrative services indemnification clause possible.

Additionally, as in *Hooper Associates, Ltd.*, 74 N.Y.2d at 492, the Agreement here contains a notice provision requiring "[e]ach party [to] notify the other within 10 days of receipt of any lawsuits, claims or notices of intent to file a lawsuit based in any manner on Services." (Dkt. No. 24-1, at 19). In addition to the administrative services indemnification clause at issue,

the parties' agreement contained a clinical services indemnification clause and an employment/contracting indemnification clause. (*Id.* at 18). NAPA argues that the notice provision "is commiserate with the two other indemnification clauses not at issue here" and applying the administrative services indemnification provision to claims between the parties would not render the notice provision superfluous. (Dkt. No. 64, at 21). The notice provision, however, does not by its terms limit itself to such a construction. NAPA itself acknowledges the basic canon of interpretation that "any" means "all." (*Id.*). The provision, therefore, on its face applies to "lawsuits . . . based in *any* manner on services," (Dkt. No. 24-1, at 19) (emphasis added), including administrative services. Had the parties intended for the administrative services indemnification clause to govern disputes between the parties, the Agreement could have limited the scope of the notice provision to the latter two indemnification clauses, but it did not.

Moreover, "[t]he presumption is that the agreement does not cover attorney fees in an action between the parties. Thus, if the indemnity provision . . . is subject to a reasonable interpretation one way or another, the agreement must be construed not to indemnify[.]" *In re Refco Inc. Secs. Litig.*, 890 F. Supp. 2d 332, 343 (S.D.N.Y. 2012). Therefore, if there is any doubt as to the interpretation of the provision, the Court must choose the interpretation aligned with its reasoning herein and find the indemnification clause inapplicable here. This is consistent with a long line of cases where courts considered similar indemnity language and dismissed indemnification claims because the language did not meet the threshold of being "unmistakably clear." *See Scott-Macon Sec., Inc. v. Zoltek Cos., Inc.*, No. 06-cv-2711, 2007 WL 2914873, at *5–6, 2007 U.S. App. LEXIS 23356, at *14–18 (2d Cir. Oct. 4, 2007); *Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc.*, 98 F.3d 13, 21 (2d Cir. 1996); *Rensselaer Polytechnic Inst.*

*v. Cadence Design Sys., Inc.*, No. 13-cv-1210, 2014 WL 12675264, at *3, 2014 U.S. Dist.
LEXIS 200091, at *8–10 (N.D.N.Y. July 25, 2014); *Fernandez v. Kinray, Inc.*, No. 13-cv-4938,
2014 WL 12778829, at *3, 2014 U.S. Dist. LEXIS 17954, at *13–15 (E.D.N.Y. Feb. 5, 2014);
*Sequa Corp. v. Gelmin*, 851 F. Supp. 106, 110–11 (S.D.N.Y. 1994). St. Joseph's cites to this
body of case law, (Dkt. No. 57-1, at 20), and NAPA's response is that "[u]nlike these cases, the
Agreement's indemnity clause is unmistakably clear and does not cover only third-party claims."
(Dkt. No. 64, at 20 n.3). The Court disagrees. As described above, and as in the caselaw cited by
St. Joseph's, the Agreement's indemnity clause is *not* unmistakably clear, and the Court declines
to read a duty to indemnify NAPA for a suit between contracting parties into the contract.
Therefore, NAPA's counterclaim for declaratory relief confirming that St. Joseph's must
indemnify NAPA and pay NAPA's reasonable attorney's fees and costs in connection with this
lawsuit is dismissed.

### 3.    Tortious Interference with a Contract

NAPA's last counterclaim is for tortious interference with contractual relations. (Dkt. No.
53, ¶¶ 69–79, at 35–36). NAPA alleges that St. Joseph's improperly interfered with the
employment agreements between NAPA and its clinicians by inducing the clinicians to cease
their employment with NAPA in violation of the non-compete provisions in the contracts. (*Id.*).
St. Joseph's argues that NAPA fails to adequately plead critical elements necessary to state a
claim for tortious interference. (Dkt. No. 57-1, at 21).

The elements of tortious interference with contractual relations are: "[1] the existence of
a valid contract between the plaintiff and a third party, [2] defendant's knowledge of that
contract, [3] defendant's intentional procurement of the third-party's breach of the contract
without justification, [4] actual breach of the contract, and [5] damages resulting therefrom."
*Rich v. Fox News Network, LLC*, 939 F.3d 112, 126–27 (2d Cir. 2019) (quoting *Lama Holding*

*Co. v. Smith Barney Inc.*, 88 N.Y.2d 413, 424 (1996)). St. Joseph's argues that NAPA fails to adequately identify the contracts or their validity. (Dkt. No. 57-1, at 21–23).

To adequately plead the existence of a valid contract, a party cannot "[m]erely plead[ ] the existence of a contract," but rather must provide "details about the contracts—such as when they were formed, when they took place, and what the major terms were—or even attach the contracts to the complaint." *Lokai Holdings, LLC v. Twin Tiger USA, LLC*, 306 F. Supp. 3d 629, 643 (S.D.N.Y. 2018); *Plasticware v. Flint Hills Res.*, 852 F. Supp. 2d 398, 404 (S.D.N.Y. 2012). St. Joseph's argues that NAPA has failed to meet this burden here as it does not "identify the parties to the contracts, the terms of the contracts, or even the specific terms of the noncompete clauses that it alleges that St. Joseph's wishes the providers to breach." (Dkt. No. 57-1, at 21). NAPA responds, without citation to case law or Plaintiff's Complaint, that because the Complaint addresses these same employment agreements, St. Joseph's cannot feign ignorance about them. (Dkt. No. 64, at 21–22). While St. Joseph's may have had knowledge about the agreements, that goes to the second element of tortious interference – knowledge of the contract – not to the first – the existence of a valid contract.

NAPA's Amended Counterclaims allege that "NAPA and its clinicians have a valid, enforceable contract that St. Joseph's has improperly interfered with" and that "NAPA employs anesthesiologists and CRNAs who have signed employment agreements that contain a variety of provisions, including ones addressing the ability to compete following termination of employment." (Dkt. No. 53, ¶¶ 70–71, at 35). These allegations are conclusory and essentially, merely plead the existence of a contract. They do not provide details about when the employment agreements were formed, what the major terms were, nor do they even provide the non-compete language. The agreements were not attached to the Amended Counterclaims. This lack of detail

is significant, because a noncompete clause is only enforceable if it is, *inter alia*, "reasonable in time and area" and "necessary to protect the employer's legitimate interests." *BDO Seidman*, 93 N.Y.2d at 389. Without the specific language of the agreements, it is impossible for the Court to consider whether the noncompete clauses at issue in this case could potentially meet those standards.

NAPA argues that it "does not need to prove that the non-compete agreements are reasonable and enforceable" at this stage of the proceedings. (Dkt. No. 64, at 22). In so arguing, NAPA cites to a long body of case law, but critically, each of those cases provided the court with enough information to determine whether it was even plausible that the agreements were reasonable and enforceable. *See Adecco USA, Inc. v. Staffworks, Inc.*, No. 20-cv-744, 2021 WL 2593304, at *6–8, 12, 2021 U.S. Dist. LEXIS 117445, at *17–22, 33 (N.D.N.Y. June 23, 2021) (considering the exact language of the restrictive covenant at issue, the legitimate business interests it supported, and the limitations by time and area); *Liberty Mutual Ins. Co. v. Guereschi*, No. 17-cv-1152, 2020 WL 1307315, at *2, 2020 U.S. Dist. LEXIS 47950, at *5 (W.D.N.Y. Mar. 19, 2020) (considering non-compete provisions effective for two years that prohibited specific conduct with respect to specific clients); *Advance 2000, Inc. v. Harwick*, No. 16-cv-1037, 2019 WL 6725977, at *4, 2019 U.S. Dist. LEXIS 213326, at *11 (W.D.N.Y. Dec. 11, 2019) (considering non-compete provisions effective for two years and spanning 50 miles); *Installed Bldg. Prods., LLC v. Cottrell*, No. 13-cv-1112, 2014 WL 3729369, at *2, 2014 U.S. Dist. LEXIS 101926, at *4 (W.D.N.Y. July 25, 2014) (considering a non-compete provision effective for two years and spanning 100 miles that prohibited specific, enumerated conduct); *Nostrum Pharmaceuticals, LLC v. Dixit*, No. 13-cv-8718, 2014 WL 4370695, at *3, 2014 U.S. Dist. LEXIS 123775, at *6–8 (S.D.N.Y. Sept. 2, 2014) (quoting the non-compete and non-solicitation

clauses at issue in the case); *SD Prot., Inc. v. Del Rio*, 498 F. Supp. 2d 576, 579 (E.D.N.Y. 2007) (quoting the non-compete clause and the associated clause defining "competition"). In all of these cases, details about the non-competes were before the court such that it could determine whether the party plausibly stated a claim, even if it was premature to actually decide whether the agreements were valid and enforceable. Here, the Court does not have the non-compete language and the allegations are so bare with respect to the contracts at issue that it cannot find that NAPA plausibly stated a claim.

Moreover, even if the allegations sufficiently identified the agreements, St. Joseph's argues that the counterclaim still fails because NAPA has not adequately alleged that the non-compete provisions protect a legitimate business interest. (Dkt. No. 57-1, at 22). NAPA alleges that the non-compete provisions protect NAPA's business interests in:

> (1) recruiting and retaining a unique set of clinicians that have a special and trusting relationship with its clients, including St. Joseph's, the surgeons, proceduralist, and perioperative nurses at the hospital; (2) training its chiefs on best practices in terms of operating room efficiency, inclusion, problem resolution, and culture building; (3) building its talent base by using unique and proprietary talent acquisition and onboarding processes, which allows it to retain excellent clinicians; [and] (4) developing a robust and unique learning and knowledge base for its clinicians.

(Dkt. No. 53, ¶ 73, at 35). These alleged interests do not include trade secrets or confidential customer lists, so the only plausible legitimate business interest under *BDO Seidman* is "protection from competition by a former employee whose services are unique or extraordinary." 93 N.Y.2d at 389. In general, "professionals are deemed to provide 'unique or extraordinary' services," but that does not necessarily "dictate the result," because the analysis must focus "on the particular facts and circumstances giving context to the agreement." *Id.* at 389–90 (citation omitted). This is because the "rationale for giving wider latitude to covenants between members

of a learned profession because their services are unique or extraordinary" may not apply where

a national firm is "seeking to enforce the agreement within a market consisting of the entirety of

a major metropolitan area" and the employee's "status in the firm was not based upon the

uniqueness or extraordinary nature of the . . . services he generally perform[ed] on behalf of the

firm, but in major part on his ability to attract a corporate clientele," especially where there is no

proof that the employee "possessed any unique or extraordinary ability . . . that would give him a

competitive advantage over [the employer.]" *Id.* at 390.

Here, NAPA, a national entity, is seeking to enforce a non-compete with respect to all of

the NAPA clinicians working at St. Josephs. (Dkt. No. 1, ¶ 16, Dkt. No. 53, ¶ 71, at 35). St.

Joseph's argues that "the 'special and unique' category has never been applied to a whole group

of employees, as NAPA seeks to do here." (Dkt. No. 57-1, at 17). Indeed, the Second Circuit has

noted that unique services have been found where services "are dependent on an employee's

special talents," like "musicians, professional athletes, [and] actors," and injunctive relief has

been available "where the "*individual* performer has such ability and reputation that his or her

place may not easily be filled" – an inquiry that "must of necessity be on a case-by-case basis."

*Ticor Title Ins. Co. v. Cohen*, 173 F.3d 63, 65, 70 (2d Cir. 1999) (emphasis added). As explained

above, NAPA's allegations do not identify the clinicians it is seeking to enforce the non-compete

against, their credentials, or their specific skills and relationships. With such bare pleading, the

Court "struggles to imagine . . . how every [anesthesiologist] who signed [NAPA's] 'standard

employment contract' offered unique or extraordinary services." *Magtoles v. United Staffing

Registry, Inc.*, 665 F. Supp. 3d 326, 348 (E.D.N.Y. 2023) (granting summary judgment motion

declaring non-compete clauses in a standard employment agreement between nurses and a

staffing agency unenforceable because the nationwide scope was unreasonable; defendant did

not have a cognizable employer interest where there was no evidence the covenant protected trade secrets or that every nurse who signed the standard contract had "unique or extraordinary services"; it would be harmful to the public to have "dozens of licensed nurses and practitioners . . . prohibited from contributing their services to an industry as valuable and important as nursing"; and the clause was unreasonably burdensome to employees). Furthermore, the court notes that at least one New York state court has found that "anesthesia services . . . routinely performed at medical facilities by physicians" are "not unique" and do not constitute a "legitimate interest in enforcing the [r]estrictive [c]ovenant." *Gujral v. Anesthesia Group of Albany, P.C.*, No. 909695-23, 2023 WL 9285382, at *4, 2023 N.Y. Misc. LEXIS 23444, at *9 (Sup. Ct., Albany County Dec. 20, 2023). NAPA does not respond to these arguments, nor does its reply distinguish between the alleged legitimate business interests supported by the non-solicitation clause versus the non-compete clauses. (*See* Dkt. No. 64, at 16–18). As such, the Court agrees that NAPA's bare pleading fails to allege that the non-competes protect a legitimate business interest. *See Heartland Sec. Corp. v. Gerstenblatt*, No. 99-cv-3694, 2000 WL 303274, at *10, 2000 U.S. Dist. LEXIS 3496, at *29–30 (S.D.N.Y. Mar. 22, 2000) ("Heartland has failed to show that the purpose of the restrictive covenant was to protect a legitimate business interest. . . . Heartland's claim for breach of restrictive covenant is dismissed [pursuant to Fed. R. Civ. P. 12(b)(6).]" Therefore, NAPA's counterclaim for tortious interference with contractual relations is dismissed.

### 4.    LEAVE TO AMEND

To the extent the Court found the counterclaims deficient, NAPA moved for leave to amend.[8] (Dkt. No. 64, at 23). St. Joseph's opposes the motion. (Dkt. No. 68, at 8). Under Federal

---

[8] Here, NAPA has already amended its counterclaims once, (*see* Dkt. Nos. 20, 53), in response to the same arguments in Plaintiff's first Motion to Dismiss Counterclaim Plaintiffs' Counterclaims (Dkt. No. 45). However, NAPA did not

Rule of Civil Procedure 15(a), absent certain circumstances not at play here, a party may amend its pleading only with the opposing party's written consent or the court's leave. *See* Fed. R. Civ. P. 15(a)(1)–(2). Rule 15(a)(2) requires that a court "freely give leave when justice so requires." *See McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007). A court may, in its discretion, deny leave to amend "for good reason, including futility, bad faith, undue delay, or undue prejudice to the opposing party." *MSP Recovery Claims, Series LLC v. Hereford Ins. Co.*, 66 F.4th 77, 90 (2d Cir. 2023). A request to amend is futile where the problem with the claim is "substantive" and "better pleading will not cure it." *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000).

The problem with NAPA's indemnification claim is substantive, and better pleading cannot prove that the agreement is "unmistakably clear" that the parties agreed to indemnify one another in an action between the parties. Better pleading could, however, provide more detailed allegations about the employment agreements underlying the tortious interference with a contract counterclaim and whether the clinicians are unique and extraordinary. As such, the Court grants NAPA's motion for leave to amend, solely with respect to the tortious interference with a contract counterclaim.

## IV.    DEFENDANTS' MOTION TO DISMISS FOR LACK OF STANDING[9]

### A.    Standard of Review

"Article III of the Constitution limits federal courts' jurisdiction to certain 'Cases' and 'Controversies,'" and "[o]ne element of the case-or-controversy requirement is that plaintiffs

---

originally include the tortious interference with a contract counterclaim, and so it has not yet had a chance to amend that counterclaim.

[9] Defendants do not move to dismiss St. Joseph's claims for (1) declaratory and injunctive relief pursuant to the Sherman Act and the Donnelly Act; (2) declaratory judgment under New York law; and (3) damages and declaratory and injunctive relief pursuant to its breach of contract claim. (Dkt. No. 77-1, at 5 n.1). Therefore, these claims persist.

must establish that they have standing to sue." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013) (citation and internal quotation marks omitted). To establish standing, "[t]he plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). "[T]he party invoking federal jurisdiction[ ] bears the burden of establishing [standing]," *id.*, and the party must establish standing for "each form of relief requested in the complaint." *Town of Chester v. Laroe Ests., Inc.*, 581 U.S. 433, 439 (2017); *Lewis v. Casey*, 518 U.S. 343, 358 n.6 (1996). "To evaluate a motion to dismiss for lack of standing, [courts] ask whether the plaintiff plausibly alleged the existence of each of the three elements." *Liu v. United States Cong.*, 834 F. App'x 600, 602 (2d Cir. 2020).

Rule 12(b)(1), which provides that a court may dismiss a claim for lack of subject matter jurisdiction, is the proper procedural route to bring a standing challenge. *All. for Env't Renewal, Inc. v. Pyramid Crossgates Co.*, 436 F.3d 82, 88 n.6 (2d Cir. 2006); *see also Lyons v. Litton Loan Servicing LP*, 158 F. Supp. 3d 211, 218 (S.D.N.Y. 2016) (noting that a lack of standing "may be addressed through a Rule 12(b)(1) motion"). "In resolving a motion to dismiss under Rule 12(b)(1), the district court must take all uncontroverted facts in the complaint (or petition) as true, and draw all reasonable inferences in favor of the party asserting jurisdiction." *Tandon v. Captain's Cove Marina of Bridgeport, Inc.*, 752 F.3d 239, 243 (2d Cir. 2014). A 12(b)(1) motion for lack of subject-matter jurisdiction is distinct from and should not be conflated with a 12(b)(6) motion for failure to state a claim upon which relief can be granted. *Toretto v. Donnelly Fin. Sols. Inc.*, 523 F. Supp. 3d 464, 473 (S.D.N.Y. 2021) ("The issue of standing is distinct from whether a plaintiff has a cause of action [but] . . . litigants frequently conflate standing and merits issues.").

**B.    Discussion[10]**

Defendants' motion is a facial attack on whether St. Joseph's has standing to recover monetary damages from Defendants in connection with Plaintiff's antitrust claims.[11] (Dkt. No. 77-1, at 5 n.2). Defendants argue that the Complaint should be dismissed for lack of subject matter jurisdiction because Plaintiff's injuries are not fairly traceable to NAPA's conduct and cannot be redressed by a favorable judicial decision. (*Id.* at 5).

**1.    Traceability**

The traceability element of standing analysis requires "a causal connection between the injury and the conduct complained of[.]" *Lujan*, 504 U.S. at 560. However, this requirement is not an "onerous standard" and is lower than "proximate causation." *Miller v. Syracuse Univ.*, 662 F. Supp. 3d 338, 352 (N.D.N.Y. 2023) (quoting *Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 55 (2d Cir. 2016)). "[A]n intervening cause . . . is not necessarily a basis for finding that the injury is not 'fairly traceable' to the acts of the defendant." *Rothstein v. UBS AG*, 708 F.3d 82, 92 (2d Cir. 2013), *superseded by statute on other grounds*, 18 U.S.C. § 2333. An injury can be traceable to a defendant's conduct even if the causal link is indirect. *Heldman v. Sobol*, 962 F.2d 148, 156 (2d Cir. 1992). Article III "requires no more than *de facto* causality." *DOC v. New York*, 588 U.S. 752, 768 (2019) (quoting *Block v. Meese*, 793 F. 2d 1303, 1309 (D.C. Cir. 1986)).

Here, the Complaint alleges that St. Joseph's tried to exit the parties' Agreement in April 2022, but "found that it was unable to recruit replacement anesthesiologists" because of the

---

[10] The parties have relied on, analyzed, and distinguished Eleventh Circuit precedent, (*see, e.g.*, Dkt No. 77-1, at 9; Dkt. No. 79, at 11–12). The Court is not bound by the Eleventh Circuit precedent and has focused its analysis on relevant Second Circuit precedent.

[11] The same analysis applies with respect to Plaintiff's antitrust claims under both the Sherman Act and the Donnelly Act. *See Biocad JSC v. F. Hoffmann-La Roche*, 942 F.3d 88, 101 (2d Cir. 2019) (noting that New York's Donnelly Act "is modeled after the Sherman Act and should generally be construed in light of Federal precedent" (citation and internal quotation marks omitted)); *Assocs. Capital Servs. Corp. of N.J. v. Fairway Private Cars, Inc.*, 590 F. Supp. 10, 13 (E.D.N.Y. 1982) (citing cases).

"noncompete agreements." (Dkt. No. 1, ¶ 45). "Defendants demanded an unreasonable amount to 'buy out' the noncompetes, more than 1.5 times the annual salary of each provider," and for this reason "St. Joseph's rescinded its notice of non-renewal, effective December 31, 2022. (*Id.*). The Complaint further alleges that NAPA's "insistence on enforcement of their noncompetes has forced St. Joseph's to accept the unreasonable terms demanded by Defendants, to pay exorbitant amounts for anesthesia services, and to accept the staffing inadequacies and shortfalls engaged in by Defendants"; that NAPA's "exercise of monopoly power has been made possible because of the noncompetes and nonsolicitation clause"; that the noncompete agreements and non-solicitation clause have unreasonably restrained trade; that Defendants' actions constitute unlawful monopolization; and that St. Joseph's has suffered damages of "at least $6 million" from the unreasonable terms. (*Id.* ¶¶ 61, 114, 139, 144, 148). St. Joseph's argues that its injuries are traceable to NAPA because St. Joseph's "was forced to accept numerous extensions to its agreement with Defendants, despite the increasing payment levels involved and inadequate staffing, because the non-solicitation clause and noncompete clauses gave it no alternative." (Dkt. No. 79, at 11). St. Joseph's further argues that it "would have exited the Agreement and no longer dealt with NAPA" if not for the alleged antitrust violations. (*Id.*).

St. Joseph seeks damages for its "loss of revenues due to understaffing and overpayment to NAPA." (Dkt. 79, at 20). NAPA argues that Plaintiff's higher costs and "potential lost revenue" are attributable to the Agreement between the parties and not an antitrust violation. (Dkt. No. 77-1, at 9–10). NAPA argues that because the dispute is predicated on "contractual provisions to which St. Joseph's agreed," the higher costs are not traceable, since "a controversy is not justiciable when a plaintiff independently caused his own injury." (*Id.* at 11 (quoting *Swann v. Sec'y, Ga.*, 668 F.3d 1285, 1288 (11th Cir. 2012))). However:

> [S]tanding is not defeated merely because the plaintiff has in some
> sense contributed to his own injury. Standing is defeated only if it is
> concluded that the injury is so completely due to the plaintiff's own
> fault as to break the causal chain. So long as the defendants have
> engaged in conduct that may have contributed to causing the injury,
> it would be better to recognize standing[.]

*St. Pierre v. Dyer*, 208 F.3d 394, 402 (2d Cir. 2000) (quoting 13 Charles Alan Wright & Arthur

R. Miller, *Federal Practice and Procedure* § 3531.5, at 457–58, 461 (2d ed. 1984)). While St.

Joseph's did enter into the Agreement, the Complaint alleges that the noncompetes precluded St.

Joseph's "from accessing any realistic alternative." (*See* Dkt. No. 1, ¶¶ 59-61, 138, 140–155).

Even if the costs to St. Joseph's are obligated under the Agreement, St. Joseph's alleges that it

would not have renewed the agreement but for NAPA's alleged anticompetitive conduct. (*Id.*).

At this stage of the litigation, St. Joseph's has plausibly plead injuries fairly traceable to

Defendants' alleged anticompetitive conduct.[12]

NAPA additionally argues that "the national shortage of anesthesia providers is in no way

attributable to NAPA," and cites to inapposite case law primarily from the Eleventh Circuit

pertaining to independent sources of causation. (Dkt. No. 77-1, at 11–12). Traceability does

indeed require that the injury is not the result of the "independent action of some third party not

before the court." *Lujan*, 504 U.S. at 560 (quoting *Simon v. Eastern Ky. Welfare Rights

Organization*, 426 U.S. 26, 41–42 (1976)). However, "[a] defendant's conduct that injures a

plaintiff but does so only indirectly, after intervening conduct by another person, may suffice for

Article III standing." *Carter*, 822 F.3d at 55–56. Here, St. Joseph's argues that the shortage of

---

[12] In its response in opposition, St. Joseph's argues that its "execution of the agreement does not bar its claim," citing to cases discussing the *in pari delicto* defense and analyzing the "combination or conspiracy" element of a Sherman Act Section 1 claim. (Dkt. No. 79, at 15–16). St. Joseph's also analyzes tying agreements to argue that NAPA's theories are "antithetical to some of the most basic principles of antitrust jurisprudence." (*Id.* at 13). In its reply, NAPA contends that these are "merits arguments that are irrelevant to the Court's constitutional standing analysis." (Dkt. No. 80, at 5). The Court has only addressed the constitutional standing issue raised by NAPA and declines to consider these arguments.

anesthesia providers is a market condition that contributed to Defendants' market power, not an independent cause that breaks the chain of causation between the alleged antitrust violation and the injury. (Dkt. No. 79, at 18–19). Drawing all reasonable inferences in favor of St. Joseph's, the nationwide shortage of anesthesia providers is not the sole source of Plaintiff's injuries. Although the nationwide shortage may have made it harder for St. Joseph's to find providers, the non-solicitation and noncomplete clauses allegedly gave St. Joseph's no alternative to find and employ providers. St. Joseph's has plausibly alleged that NAPA's alleged anticompetitive conduct was thus a substantial factor in producing the alleged injuries.

Next, NAPA argues that a party cannot predicate a claim under Section 1 of the Sherman Act on a contract to which it is a party. (Dkt. No. 77-1, at 10). The case NAPA relies on, though, is an out-of-circuit district court decision deciding a 12(b)(6) motion. *Patt v. Antech Diagnostics, Inc.*, No. 8:18-cv-1689, 2020 WL 5076970, at \*4, 2020 U.S. Dist. LEXIS 160220, at \*10–11 (C.D. Cal. May 18, 2020). The issue before the Court here, is standing, i.e. whether the alleged injuries are fairly traceable to Defendants' alleged antitrust violations, not whether the Complaint states a cause of action. *See Toretto*, 523 F. Supp. 3d at 476 ("[I]n the context of a Rule 12(b)(1) challenge to Plaintiffs' standing, Defendants again tempt the Court to conflate a merits inquiry with standing. To the extent that Plaintiffs have failed to plead a cause of action, that issue is properly raised in the context of a motion under Rule (12)(b)(6).").

Lastly, NAPA argues that "St. Joseph's cannot rely on alleged injuries giving rise to its breach of contract claim to establish standing for its antitrust claims" and instead "must establish standing separately for its antitrust claims[.]" (Dkt. No. 77-1, at 12). However, NAPA has not cited any caselaw suggesting that injuries supporting one claim cannot also support another claim. And St. Joseph's has cited cases in which courts have found standing to bring more than

one claim based on a single injury. (Dkt. No. 79, at 19 (citing *In re* Healthcare Real Estate

Partners, LLC, 941 F.3d 64, 72 (3d Cir. 2019) ("[I]t is axiomatic that a plaintiff may assert

multiple claims for the same injury[.]"); *Wilding v. DNC Servs. Corp.*, 941 F.3d 1116, 1125

(11th Cir. 2019) (finding that the same economic harm served as the "alleged injury-in-fact for

[plaintiffs'] fraud, negligent misrepresentation, [District of Columbia Consumer Protection

Procedures Act], and unjust enrichment claims"))). In any event, the issue here is whether St.

Joseph's has plausibly alleged injuries fairly traceable to Defendants' alleged antitrust violations,

and the Court finds that it has.

### 2.    Redressability

The redressability element of standing requires the plaintiff to show that "it is likely, as

opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends

of the Earth, Inc. v. Laidlaw Env't. Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000). Here, St.

Joseph's contends that its higher costs and potential lost revenue resulting from Defendants'

exploitation of their monopoly power are redressable by damages. (Dkt. No. 79, at 20). In effect,

St. Joseph's is seeking compensatory damages, to "make good or replace the loss caused by the

wrong or injury." *FAA v. Cooper*, 566 U.S. 284, 307 (2012). "[C]ompensatory damages . . . are

definitionally 'intended to redress the concrete loss that the plaintiff has suffered by reason of the

defendant's wrongful conduct.'" *Soule v. Conn. Ass'n of Sch., Inc.*, 90 F.4th 34, at 47 (2d Cir.

2023) (quoting *Cooper Indus., Inc. v. Leatherman Tool Grp., Inc.*, 532 U.S. 424, 432 (2001)).

NAPA argues, in a single paragraph and without citation to case law, that St. Joseph's

desired relief would not be remedied by its antitrust challenges to the restrictive covenants,

because the Agreement contains a severability clause so St. Joseph's will continue to be liable

for any payments owed under the Agreement. (Dkt. No. 77-1, at 12). However, as St. Joseph's

argues, the Agreement does not override antitrust laws. If St. Joseph's suffered injuries due to

antitrust violations, those damages would be compensable even if, in a breach of contract action, the restrictive covenants were severed from the contract. (Dkt. No. 79, at 21). The Court thus finds that St. Joseph's has plausibly alleged that its alleged injuries will likely be redressed by a favorable decision.

## V.    CONCLUSION

For these reasons, it is hereby

**ORDERED** that Plaintiff's motion to dismiss (Dkt. No. 57) is **GRANTED in part and DENIED in part**; and it is further

**ORDERED** that Defendants' counterclaims for indemnification and tortious interference with a contract (Dkt. No. 53) are **DISMISSED** under Fed. R. Civ. P. 12(b)(6) for failure to state a claim; and it is further

**ORDERED** that Defendants' request for leave to amend is **GRANTED**, solely with respect to the tortious interference with a contract counterclaim, and any amended counterclaim must be filed within thirty days of the date of this decision; and it is further

**ORDERED** that Defendants' motion to dismiss Plaintiff's antitrust claims for monetary damages for lack of standing (Dkt. No. 77) is **DENIED**.

**IT IS SO ORDERED.**

Dated:  December 2, 2024
        Syracuse, New York

Brenda K. Sannes
Chief U.S. District Judge